# United States Court of Appeals for the Third Circuit

IN RE:

WHITTAKER, CLARK & DANIELS INC.,

*Debtor*

(*Caption continued on inside cover*)

## PETITION FOR REHEARING OR REHEARING EN BANC

CULLEN D. SPECKHART
MICHAEL KLEIN
JEREMIAH P. LEDWIDGE
COOLEY LLP
55 Hudson Yards
New York, NY 10001

KEVIN C. MACLAY
TODD E. PHILLIPS
KEVIN M. DAVIS
SERAFINA A. CONCANNON
CAPLIN & DRYSDALE, CHARTERED
1200 New Hampshire Ave NW, 8th Floor
Washington, DC 20036

ARTHUR J. ABRAMOWITZ
ROSS J. SWITKES
SHERMAN, SILVERSTEIN, KOHL, ROSE &
PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057

ELIZABETH B. PRELOGAR
CARLTON E. FORBES
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
eprelogar@cooley.com

MATTHEW KUTCHER
COOLEY LLP
110 North Wacker Drive, Suite 4200
Chicago, IL 60606

ALLISON W. O'NEILL
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121

BENJAMIN SWEENEY
COOLEY LLP
1700 Seventh Avenue, Suite 1900
Seattle, WA 98101

MATTHEW OLIVER
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736

*Counsel to Appellant Official Committee of Talc Claimants*

PETER PROTOPAPAS,

*Appellant in No. 24-2210*

OFFICIAL COMMITTEE OF TALC CLAIMANTS,

*Appellant in No. 24-2211*

---

On Appeal from the United States District Court for the District of New Jersey
(D.C. Nos. 3:23-cv-04151; 3:23-cv-04156)
District Judge: Honorable Zahid

---

IN RE: WHITTAKER, CLARK & DANIELS INC.,

*Debtor*

WHITTAKER CLARK & DANIELS INC.; BRILLIANT NATIONAL SERVICES INC.; L. A. TERMINALS INC.; SOCO WEST INC.,

v.

BRENNTAG AG, BRENNTAG CANADA INC.; BRENNTAG GREAT LAKES LLC; BRENNTAG MID-SOUTH INC.; BRENNTAG NORTH AMERICA INC.; BRENNTAG NORTHEAST INC.; BRENNTAG PACIFIC INC.; BRENNTAG SOUTHEAST INC.; BRENNTAG SOUTHWEST INC.; BRENNTAG SPECIALTIES LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc.); COASTAL CHEMICAL CO. LLC; MINERAL PIGMENT SOLUTIONS INC.; THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT; JOHN AND JANE DOES 1-1000; JULIET M. GRAY; KYUNG H. LEE

OFFICIAL COMMITTEE OF TALC CLAIMANTS,

*Appellant*

---

On Appeal from the United States Bankruptcy Court for the District of New Jersey
(Bankr. Ct. Adv. Pro. No. 23-01245)
Bankruptcy Judge: Honorable Michael B. Kaplan

## TABLE OF CONTENTS

**Page**

RULE 35.1 STATEMENT .................................................................................i

INTRODUCTION .........................................................................................1

BACKGROUND ..........................................................................................3

    I.     Factual Background.........................................................................3

    II.    The Panel Decision.........................................................................4

ARGUMENT ..............................................................................................6

    I.     The Panel Opinion Conflicts With Precedent Of This Court and All Other Circuits to Have Addressed This Issue ..............................6

    II.    If *Emoral* Renders Product-Line Claims Estate Property, It Was Wrongly Decided and Should Be Overruled .....................................11

    III.   The Question Presented Is Exceptionally Important..........................15

CONCLUSION ...........................................................................................17

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahcom v. Smeding*,
   623 F.3d 1248 (2010)............................................................................................10

*In re Bernard L. Madoff Inv. Sec. LLC*,
   740 F.3d 81 (2d Cir. 2014) ..............................................................................13

*Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown*,
   296 F.3d 164 (3d Cir. 2002) ...............................................................6, 7, 8, 12

*Butner v. United States*,
   440 U.S. 48 (1979)...............................................................................................9

*In re Educators Grp. Health Tr.*,
   25 F.3d 1281 (5th Cir. 1994) .........................................................................9, 14

*In re Emoral*,
   740 F.3d 875 (3d Cir. 2014) ......................................................................*passim*

*Harrington v. Purdue Pharma L.P.*,
   603 U.S. 204 (2024)...............................................................................1, 15, 16

*In re Icarus Holding, LLC*,
   391 F.3d 1315 (11th Cir. 2004) .....................................................................10, 13

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
   8 F.3d 130 (2d Cir. 1993) ....................................................................................9

*Koch Refining v. Farmers Union Cent. Exch., Inc.*,
   831 F.2d 1339 (7th Cir. 1987) ...........................................................................14

*In re Nejberger*,
   934 F.2d 1300 (3d Cir. 1991) ..............................................................................9

*In re Ozark Rest. Equip. Co.*,
   816 F.2d 1222 (1987)..........................................................................................10

*Ramirez v. Amsted Indus., Inc.*,
   431 A.2d 811 (N.J. 1981) ....................................................................................11

**Page(s)**

*Steyr-Daimler-Puch of Am. Corp. v. Pappas*,
852 F.2d 132 (4th Cir. 1988) ...........................................................................9

*In re Teknek LLC*,
563 F.3d 639 (2009)................................................................................. 13-14

*In re Tronox*,
855 F.3d 84 (2017)........................................................................................14

*In re Van Dresser Corp.*,
128 F.3d 945 (6th Cir. 1997) .......................................................................14

*In re Wilton Armetale*,
968 F.3d 273 (3d Cir. 2020) ...................................................................*passim*

**Statutes**

11 U.S.C. § 524(g) ....................................................................................3, 16

11 U.S.C. § 541(a) ............................................................................2, 6, 7, 13

# RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to binding precedent, including this Court's decisions in *In re Wilton Armetale*, 968 F.3d 273 (3d Cir. 2020), *In re Emoral*, 740 F.3d 875 (3d Cir. 2014), and *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown*, 296 F.3d 164 (3d Cir. 2002), and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this Court. In addition, this appeal involves a question of exceptional importance to tort victims and to the proper functioning of the bankruptcy system, *i.e.*, whether successor-liability claims, including product-line claims, should be treated as estate property under the Bankruptcy Code when the claims do not involve injury to the debtor, could not have been asserted by the debtor on its own behalf under state law, and would not produce a recovery that would inure to the benefit of all creditors.

Dated:  October 1, 2025 

/s/ Elizabeth B. Prelogar   
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue NW,
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel to Appellant the*
*Official Committee of Talc Claimants*

i

## INTRODUCTION

The panel opinion in this case blesses a grave injustice—while departing from the plain text of the Bankruptcy Code, this Court's prior precedent, decisions from other circuits, and recent guidance from the Supreme Court. For decades, Whittaker, Clark & Daniels, Inc. ("WCD") and its affiliates ("Debtors") sold asbestos-contaminated talc, resulting in claims by thousands of victims who developed mesothelioma—a fatal disease. Facing mounting liability, Debtors sold their operating business to Brenntag, a Bain Capital subsidiary, leaving behind only corporate shells with limited assets.

Then they turned to the bankruptcy system to shield Brenntag—a solvent third party—from successor liability "without securing the consent of those affected or placing anything approaching [Brenntag's] total assets on the table," *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209 (2024). By protecting Brenntag, Debtors would protect their own parent company, Berkshire Hathaway, which had agreed to indemnify Brenntag for any Debtor-related liability. The Bankruptcy Court rewarded this gambit, issuing an order effectively blocking every successor-liability claim being litigated against Brenntag across the country on the theory that those claims belong *not* to the victims, but somehow to Debtors themselves. This even included tort claims premised on a "product line" theory of liability—an important strict-liability state-law remedy available only to victims injured by a defective

1

product line that is later sold to and operated by another company. On appeal, the panel affirmed, thereby transferring control of the victims' claims to the very tortfeasors who injured them and enabling them to settle with their corporate allies for pennies on the dollar.

That holding is profoundly wrong. Section 541(a)(1) of the Bankruptcy Code limits estate property to prepetition "legal or equitable interests *of the debtor*." 11 U.S.C. § 541(a)(1) (emphasis added). This Court's precedent therefore makes clear that a creditor claim is estate property only if it involves "harm done mainly to the debtor" that merely "indirectly injure[s] the creditors"—for example, "plundering" of the debtor that creates a derivative injury for all creditors. *In re Wilton Armetale*, 968 F.3d 273, 283 (2020). The panel purported to derive a different rule from *In re Emoral*, 740 F.3d 875 (3d Cir. 2014), but that decision draws the same lines: A victim's claim qualifies as estate property if "the debtor could have asserted the claim on his own behalf under state law" (representing direct harm to the debtor) and recovery on the claim would "inure[] to the benefit of all creditors" (representing derivative injury to the creditors). *Id.* at 879.

To comply with the statute, these limits must be strictly enforced—but the panel here ignored them. Debtors suffered no direct harm at Brenntag's hands and certainly could not assert a product-line claim on their own behalf. And the creditors' product-line claims would benefit only the affected tort victims, not all

creditors.  Under no reasonable interpretation of the Code can those victim-specific claims against a third party—a third party who did not *injure* Debtors but instead *colluded* with them—qualify as Debtors' own property.  If *Emoral* compels this result, it was wrongly decided and should be overruled.

This issue is exceptionally important.  The panel's decision hands corporate tortfeasors a roadmap to extinguish state-law remedies against nondebtors to the detriment of thousands of asbestos victims—even though the Supreme Court recently disapproved of a similar evasion of bankruptcy limits in *Purdue*.  And that result overrides procedural safeguards Congress provided in Section 524(g), which authorizes bankruptcy courts to release third parties from liability for asbestos-related claims—but only with the consent of a super-majority of tort claimants.  11 U.S.C.  § 524(g)(B)(ii)(IV)(bb).  This end-run around statutory protections for asbestos victims cannot be what Congress intended—and this Court should not allow it to stand.

## BACKGROUND

I.   **FACTUAL BACKGROUND**

Debtors were processors, manufacturers, and distributors of industrial chemicals and minerals, including talc.  Op. 8.  In 2004, they sold substantially all their operating assets to Brenntag, leaving behind only shell companies to manage asbestos and environmental liability from their former businesses.  *Id.*

3

On April 26, 2023, after a talc claimant attempted to place WCD in receivership, the company and three affiliates filed Chapter 11 petitions in the District of New Jersey. Op. 10–11. Debtors then initiated an adversary proceeding seeking a declaration that successor-liability claims against non-debtors like Brenntag were property of the estate. Op. 11–12. The Committee opposed the motion, arguing, among other things, that claims premised on a product-line theory of liability belonged to the victims, not the estate. Op. 12 n.3. But the Bankruptcy Court disagreed and granted summary judgment in favor of Debtors. Op. 12–13.[1] That order effectively ended all pending talc-asbestos litigation across the country against Brenntag.

## II.     THE PANEL DECISION

On appeal, the panel affirmed. As relevant here, the panel held that all successor-liability claims against Brenntag—including product-line claims— belonged to the bankruptcy estate.[2] The panel reasoned that "[a] claim is

---

[1] Departing from controlling precedent and other courts, the Bankruptcy Court alternatively held that § 544(a) (the so-called "strong arm clause") and § 541(a)(7) of the Bankruptcy Code authorize Debtors to assert a successor-liability claim against Brenntag even outside the familiar context of avoidance actions. The Committee explained why that is wrong, and the panel declined to consider the issue, instead focusing only on § 541(a)(1). Op. 33–34 n.15.

[2] The panel also concluded that WCD properly filed for bankruptcy notwithstanding a pending receivership order. Appellants disagree with that conclusion but do not seek rehearing on that issue.

'general'"—and so cannot be asserted by individual creditors—"if the creditor's theory of liability depends on facts concerning the relationship between the defendant and another party." Op. 28. The panel drew that rule from *Emoral*, observing that the plaintiffs' mere-continuation theory of successor liability there was not "unique to them as compared to other creditors." *Id.* (citation omitted). The panel declined to read *Emoral* to require that "a debtor be able to pursue the cause of action under state law for it to become property of the estate," deeming it irrelevant that Debtors could not "assert the Successor Liability Claims against Brenntag outside of bankruptcy." *Id.* at 30–31. And the panel found it immaterial that product-line claims are "distinct" from mere-continuation claims insofar as they "do not inure to the benefit of all creditors." *Id.* at 29–31. While acknowledging the "intuitive appeal" of that distinction, the panel dismissed it because "the facts necessary to establish liability" would be "generally available" even if Debtors' commercial and contract creditors would have no valid claim. *Id.* at 31–32 (citation omitted). The panel thus adopted a sweeping rule: Any claim that depends on the successor's relationship to a debtor is "for the Debtors to pursue or settle, not" the injured tort plaintiffs, *id.* at 29—even if the Debtors suffered no harm themselves and could not sue under state law, and even if the claim would benefit only a subset of creditors and not all of them.

**ARGUMENT**

**I.     THE PANEL OPINION CONFLICTS WITH PRECEDENT OF THIS COURT AND ALL OTHER CIRCUITS TO HAVE ADDRESSED THIS ISSUE**

The panel's boundless interpretation of what constitutes estate property cannot be squared with the plain text of § 541(a)(1) of the Bankruptcy Code or this Court's decisions in *In re Wilton Armetale*, 968 F.3d 273 (3d Cir. 2020), *In re Emoral*, 740 F.3d 875 (3d Cir. 2014), and *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown*, 296 F.3d 164 (3d Cir. 2002).  The full Court should grant rehearing to resolve this conflict.

As relevant here, the Bankruptcy Code defines estate property to include prepetition "legal or equitable interests *of the debtor* in property."  11 U.S.C. § 541(a)(1) (emphasis added).  When assessing whether that provision encompasses creditors' claims against a third party, this Court has recognized that the inquiry focuses on whether the "harm [was] done mainly to the debtor," resulting in only "indirect[] injur[y]" to creditors.  *Wilton Armetale*, 968 F.3d at 283.  "Claims alleging that 'third parties wrongfully depleted the debtor's assets' are general or derivative because 'every creditor has a similar claim for the diversion of assets of the debtor's estate.'"  *Id.* at 282 (alterations and citation omitted).  The Court has accordingly examined whether the debtor could have asserted the claim "on his own behalf" and whether "all the creditors' injuries from the plundering are the same in

kind." *Id.* at 282–83 (citation omitted). When the debtor "did not suffer harm" at the hands of third-party affiliates, this Court has held that successor-liability claims against those third parties based on veil-piercing and alter ego are for injured creditors—and not the debtor's estate—to assert. *Foodtown*, 296 F.3d at 171.

*Emoral* follows the same framework. There, the Court held that tort claims brought against a successor on the theory that it was a "mere continuation" of the debtor were estate property. 740 F.3d at 882. Although the majority observed that, "[a]s a practical matter," a debtor would not bring a successor-liability claim outside of bankruptcy, the relevant state law would allow such an action. *Id.* at 881. And the majority emphasized that prevailing on the mere-continuation claim would "benefit all creditors" because the successor would then "succeed to all of [the debtor's] liabilities" and not just its tort liabilities. *Id.* at 880. In those circumstances, the Court concluded that allowing the trustee to pursue the claims on creditors' behalf would "promote equity and avoid unfairness." *Id.* at 881.

But *Emoral* went no further. It did not endorse the panel's sweeping holding that all claims that depend on a successor's relationship with a debtor are estate property, no matter whether the theory of liability rests on direct injury to the debtor, and no matter whether recovery on the claim would benefit only some creditors and not all. Nor could it. Only claims that meet these criteria can qualify as interests

7

"of the debtor."  11 U.S.C. § 541(a)(1).  In concluding otherwise, the panel misread *Emoral* in two critical ways.

First, the panel disregarded *Emoral*'s analysis of whether the debtor could assert a claim against the third-party successor under state law.  In the panel's view, neither *Emoral* nor *Wilton Armetale* "impose[d] an additional, freestanding condition that a debtor be able to pursue the cause of action under state law for it to become property of the estate."  Op. 30.  That is wrong.  In each of those cases— and *Foodtown* before them—the Court observed that a claim is estate property if "the debtor could have asserted the claim on his own behalf under state law." *Emoral*, 740 F.3d at 879 (quoting *Foodtown*, 296 F.3d at 169 n.5); *see Wilton Armetale*, 968 F.3d at 280.  The panel suggested that this is a sufficient condition but "not [a] necessary" one.  Op. 30.  But as *Wilton Armetale* observed, a creditor's claim against a third party qualifies as estate property only if the "theory of recovery" is "derivative of harm that [the debtor] suffered directly."  968 F.3d at 282.  If the debtor has no injury that it could pursue under state law, it has no viable argument that the creditors' claims are "interests of the debtor" under § 541(a)(1).  Indeed, that was the very situation this Court confronted in *Foodtown*, where creditors asserted veil-piercing and alter-ego claims to recover from a debtor's affiliates for the debtor's withdrawal liability under ERISA.  The *Foodtown* panel observed that the debtor could not itself pursue the claim under New Jersey law because the debtor

8

"did not suffer harm from the [affiliates'] evasion of withdrawal liability; only [affected creditors] suffered such harm." 296 F.3d at 171. "As a result, the injury [wa]s personal to [the creditors]" and only they could "pursue the claim." *Id.*

That focus on a debtor's ability to bring a claim under state law reflects a foundational principle of bankruptcy law—one this Court and circuits nationwide have repeatedly recognized. While "section 541 defines property of the estate," courts "must look to state law to determine if a property right exists and to stake out its dimensions." *In re Nejberger*, 934 F.2d 1300, 1302 (3d Cir. 1991) (citing *Butner v. United States*, 440 U.S. 48, 54–55 (1979)). Thus, "[w]hether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim." *In re Educators Grp. Health Tr.*, 25 F.3d 1281, 1284 (5th Cir. 1994); *see Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (observing that an alter-ego claim qualifies as estate property only "[i]f under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil"). "[C]ourts that have confronted the issue whether an alter ego claim can be brought by the trustee" have accordingly "looked to the nature of that claim under state law." *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 135 (4th Cir. 1988).

Every circuit to consider the issue has recognized this principle. The Ninth Circuit, for example, held that an alter-ego claim against a debtor's shareholders

belonged to creditors—not the estate—because California law would not permit the debtor to assert that claim against its affiliates. *Ahcom v. Smeding*, 623 F.3d 1248, 1250–52 (2010). The Eighth Circuit likewise concluded that an alter-ego claim was "personal to the corporate creditors" because under applicable Arkansas state law such claims could not be brought by the corporation itself. *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225–26 (1987). And the Eleventh Circuit held that an alter-ego claim against a debtor's president could qualify as estate property only if the debtor was "allowed by state law" to pursue the claim—a requirement so critical the court certified the state-law issue to the Georgia Supreme Court. *In re Icarus Holding, LLC*, 391 F.3d 1315, 1321 (11th Cir. 2004). *Emoral* was consistent with all this precedent, but the panel departed from it—creating a circuit split that warrants en banc rehearing.

Second, the panel ignored *Emoral*'s requirement that a claim is estate property only if it "inures to the benefit of all creditors." 740 F.3d at 879. This requirement makes good sense: A claim that benefits *all* creditors could theoretically be brought by *any* creditor. As the Court elaborated in *Wilton Armetale*, when the creditors' theory of injury is derivative of "harm done mainly to the debtor"—for example, unlawful plundering of its assets—and all creditors stand to recover because their "injuries from the plundering are the same in kind," then the claim qualifies as estate property. 968 F.3d at 283.

But the product-line theory of liability here does not satisfy this requirement because success on the claim would not benefit all creditors. To prevail on a product-line claim, a plaintiff must prove that (1) the plaintiff was injured by the defective product, (2) the acquiring company continued to operate the same product line, and (3) the purchase of the product line destroyed the plaintiff's available remedies. *See Ramirez v. Amsted Indus., Inc.*, 431 A.2d 811, 824–25 (N.J. 1981). Unlike the mere-continuation theory of successor liability at issue in *Emoral* and the fraudulent-asset-transfer theory at issue in *Wilton Armetale*, succeeding on a product-line claim would not make Brenntag's assets available to satisfy all creditors' claims. Success on that claim would not automatically vest non-tort creditors, such as commercial creditors, with a comparable right to relief. Because other creditors have not suffered injury "the same in kind" as the tort plaintiffs, the product-line claims cannot be deemed estate property. *Wilton Armetale*, 968 F.3d at 283. The panel erred in extinguishing asbestos victims' state-law product-line remedy under the mistaken view that *Emoral* compelled that result.

## II. IF *EMORAL* RENDERS PRODUCT-LINE CLAIMS ESTATE PROPERTY, IT WAS WRONGLY DECIDED AND SHOULD BE OVERRULED

If *Emoral* means what the panel believed and requires treating the tort plaintiffs' claims against third parties as estate property, then *Emoral* was wrongly decided and should be reconsidered.

The panel understood *Emoral* to entirely ignore "the nature of the [underlying] injury" for a claim and look only to "'the "theory of liability"'" and the facts on which it relies." Op. 33 (citations omitted). But the nature of the underlying injury is key: Is the claim based on "harm done mainly to the debtor" that only "indirectly injure[s] the creditors" all "the same in kind," *Wilton Armetale*, 968 F.3d at 283, or is the claim based on liability that was "not owed to [the debtor]" itself and instead injured the creditors directly, *Foodtown*, 296 F.3d at 170? Engaging in that inquiry is the only way to reconcile all of this Court's precedents—and *Emoral* should be brought into line with them.

Indeed, the panel's understanding of *Emoral* directly contradicts this Court's prior decision in *Foodtown*. The theories of successor liability there—veil-piercing and alter-ego—were based on facts about the "relationship" among the various entities that were "generally available to any creditor." Op. 31 (citation omitted). But the *Foodtown* panel held that the claim belonged to the pension fund creditor and not the debtor's estate because it was "the direct injury to the fund—the evasion of its statutory entitlement" under ERISA that "define[d] the nature of plaintiffs' claim as a personal one." 296 F.3d at 170.

A contrary approach, as Judge Cowen explained in his *Emoral* dissent, erroneously treats successor liability as a freestanding cause of action divorced from the underlying injury. *Emoral*, 740 F.3d at 883. But a debtor attempting to settle

12

successor-liability tort claims against its own successor would not have a cause of action absent the tort plaintiffs' injuries. To be sure, if creditors wished to bring a claim against a third party based on a fraudulent conveyance, that claim would constitute estate property, because it would be "inseparable from, and predicated upon, a legal injury to the estate." *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 92 (2d Cir. 2014); *see, e.g.*, *Icarus*, 391 F.3d at 1319–21 (Claim based on "misappropriating corporate assets" was general because it "caused direct harm to the corporation and only indirect harm to [the creditor]."). But that logic does not apply to a personal-injury tort claim premised on a product-line theory of successor liability, because a debtor is not harmed by selling its operating assets to another corporate entity. It goes without saying that Debtors here did not suffer the injuries endured by mesothelioma victims. And there is no colorable claim that Brenntag fraudulently transferred assets from Debtors by purchasing the product line years before bankruptcy proceedings. Accordingly, there is no basis for Debtors to hijack the asbestos victims' product-line claims and litigate them on Debtors' own behalf.

Decisions from other circuits reinforce that a creditor's claim against a third party constitutes a prepetition "interest[] of the debtor," and thus estate property, only when it derives from an underlying injury to the debtor itself. 11 U.S.C. § 541(a)(1). The Seventh Circuit, for example, has held that it "must look to the injury for which relief is sought" and "must consider whether that injury is 'peculiar

and personal to the claimant or general and common to the corporation and creditors.'" *In re Teknek LLC*, 563 F.3d 639, 647 (2009) (quoting *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987)).  The Second Circuit, although citing *Emoral* with approval, has made clear that the relevant inquiry is whether a claim is "based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim against the debtor." *In re Tronox*, 855 F.3d 84, 103–04 (2017).  And the Sixth Circuit applies the same rule: "[I]f the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *In re Van Dresser Corp.*, 128 F.3d 945, 947 (6th Cir. 1997) (quoting *In re Educators Grp. Health Tr.*, 25 F.3d at 1284).

In short, the panel erred in understanding *Emoral* to render asbestos victims' product-line claims estate property even though Debtors were not injured by selling their product line, even though Debtors could not pursue such claims against Brenntag under state law, and even though success on the claims would not benefit all creditors.  But if that is what *Emoral* means, it reflects a fundamental error in *Emoral*'s reasoning that affects all successor-liability claims.  This Court should grant rehearing to make clear that claims grounded in individualized harm that do not derive from injury to the debtor must remain with the victims.

14

## III. THE QUESTION PRESENTED IS EXCEPTIONALLY IMPORTANT

The question whether tort victims' successor-liability claims belong to the estate is exceptionally important. It affects thousands of pending and future claims in mass-tort bankruptcies, including those involving asbestos, talc, opioids, PFAS, and other harmful products. And it determines whether victims can pursue recovery directly from solvent successor entities—or whether control of those claims can be transferred to the tortfeasors themselves and settled without the consent of the injured parties.

In that regard, the panel decision lays the groundwork to circumvent the Supreme Court's recent decision in *Purdue*. The Court held there that bankruptcy courts lack power to extinguish creditors' claims against third parties who have not "secur[ed] the consent of those affected or plac[ed] anything approaching their total assets on the table." 603 U.S. at 209. Yet that is precisely what the panel opinion sanctioned here. By treating tort victims' successor-liability claims as estate property, the decision paved the way for Debtors to propose a settlement that would release non-debtors—Brenntag, and ultimately Debtors' parent company Berkshire—from liability without the victims' consent. Under the permissive standards of Rule 9019 of the Bankruptcy Code, that release may be approved without any creditor consent whatsoever, let alone the consent of all those affected as required under *Purdue*.

That result is especially troubling given the Bankruptcy Code provides a specific mechanism for addressing third-party releases in asbestos-related bankruptcies. Under § 524(g), "courts may issue an injunction barring any action directed against a third party," *Purdue*, 603 U.S. at 222 (alterations omitted), but only after satisfying several requirements to protect unknown asbestos victims and obtaining the consent of 75% of the creditors. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). The panel decision allows debtors to circumvent § 524(g)'s consent requirement by claiming that the asbestos victims' successor-liability claims are estate property and then negotiating nonconsensual third-party releases on behalf of their corporate allies.

The panel's decision thus not only misinterprets the nature of successor liability—it also undermines the structural limits of bankruptcy jurisdiction and the protections afforded to tort victims under federal law. It transforms bankruptcy into a tool for extinguishing state-law rights without consent, contrary to the text of the Code and the Supreme Court's recent guidance. This is not just the "death knell for the Committee's argument," Op. 29; it is the death knell for thousands of mesothelioma victims with claims for relief against third parties.

Given the recurring nature of this issue and its profound consequences for tort victims, successor entities, and the bankruptcy system as a whole, this Court should

16

grant rehearing en banc and clarify the proper treatment of successor-liability claims in bankruptcy.

## <u>CONCLUSION</u>

For the foregoing reasons, the Petition for Rehearing En Banc should be granted.

Dated:  October 1, 2025          */s/ Elizabeth B. Prelogar*
ELIZABETH B. PRELOGAR
CARLTON E. FORBES
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800

CULLEN D. SPECKHART
MICHAEL KLEIN
JEREMIAH P. LEDWIDGE
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

MATTHEW KUTCHER
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
(312) 881-6500

ALLISON W. O'NEILL
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 550-6000

BENJAMIN SWEENEY
COOLEY LLP
1700 Seventh Avenue, Suite 1900
Seattle, WA 98101
(206) 452-8700

MATTHEW OLIVER
COOLEY LLP
500 Boylston Street
Boston, MA 02116-3736
(617) 731-2300

18

ARTHUR J. ABRAMOWITZ
ROSS J. SWITKES
SHERMAN, SILVERSTEIN, KOHL, ROSE
& PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057
(856) 662-0700

KEVIN C. MACLAY
TODD E. PHILLIPS
KEVIN M. DAVIS
SERAFINA A. CONCANNON
CAPLIN & DRYSDALE, CHARTERED
1200 New Hampshire Ave NW, 8th Floor
Washington, DC 20036
(202) 862-7850

*Counsel to Appellant the
Official Committee of Talc Claimants*

**CERTIFICATION OF BAR MEMBERSHIP**

Pursuant to Local Rules 28.3(d) and 46.1(e), I certify that I, Elizabeth B. Prelogar, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

Dated:  October 1, 2025 

/s/ Elizabeth B. Prelogar 
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel to Appellant the*
*Official Committee of Talc Claimants*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 31.1, I certify the following:

1.     This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because it contains 3,900 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2024.

3.     This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Vipre Virus Protection, version 3.1 was run on the file containing the electronic version of the brief and no viruses were detected.

Dated:  October 1, 2025

/s/ Elizabeth B. Prelogar
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel to Appellant the*
*Official Committee of Talc Claimants*

# CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on October 1, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


Dated:  October 1, 2025 

/s/ Elizabeth B. Prelogar 
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel to Appellant the*
*Official Committee of Talc Claimants*

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 24-2210 & 24-2211
_____

In re:  WHITTAKER CLARK & DANIELS INC,

Debtor

PETER PROTOPAPAS,

Appellant in No. 24-2210

OFFICIAL COMMITTEE OF TALC CLAIMANTS

Appellant in No. 24-2211

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 3:23-cv-04151; 3:23-cv-04156)
District Judge: Honorable Zahid N. Quraishi
_____

No. 25-1044

In re:  WHITTAKER CLARK & DANIELS INC.,

Debtor

WHITTAKER CLARK & DANIELS INC; BRILLIANT NATIONAL SERVICES INC; L.A. TERMINALS INC.; SOCO WEST INC.

v.

BRENNTAG AG; BRENNTAG CANADA INC.; BRENNTAG GREAT LAKES LLC; BRENNTAG MID-SOUTH INC.; BRENNTAG NORTH AMERICA INC.; BRENNTAG NORTHEAST INC.; BRENNTAG PACIFIC INC.; BRENNTAG SOUTHEAST INC.; BRENNTAG SOUTHWEST INC.; BRENNTAG SPE-CIALTIES LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc.); COASTAL CHEMICAL CO. LLC; MINERAL PIGMENT SOLUTIONS INC.; THOSE PARTIES LISTED ON APPENDIX A TO THE COMPLAINT; JOHN AND JANE DOES 1-1000; JULIET M. GRAY; KYUNG H. LEE

Official Committee of Talc Claimants,

Appellant

––––––––––––––––

On Appeal from the United States Bankruptcy Court
for the District of New Jersey
(Bankr. Ct. Adv. Pro. No. 23-01245)
Bankruptcy Judge: Honorable Michael B. Kaplan

––––––––––––––––

Argued on April 1, 2025

Before: KRAUSE, MATEY, and AMBRO, *Circuit Judges*

(Opinion filed: September 10, 2025)

Bryan Killian
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004

Andrew J. Gallo
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110

*Counsel for Appellant Peter Protopapas*

Matthew Kutcher
Miriam Peguero Medrano
COOLEY LLP
110 North Wacker Drive, Suite 4200
Chicago, IL 60606

Cullen D. Speckhart
Patrick J. Hayden
Michael Klein
Evan M. Lazerowitz
Jeremiah P. Ledwidge
Arielle Ambra-Juarez
COOLEY LLP
55 Hudson Yards
New York, NY 10001

Benjamin B. Sweeney
COOLEY LLP
1333 2nd Street, Suite 400
Santa Monica, CA 90401

Kathleen R. Hartnett **[ARGUED]**
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111

Cullen D. Speckhart
Carlton E. Forbes
Dale A. Davis
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004

Allison W. O'Neill
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121

Arthur J. Abramowitz
Ross J. Switkes
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, P.A.
308 Harper Drive, Suite 200
Moorestown, NJ 08057

Kevin C. Maclay
Todd E. Phillips
Kevin M. Davis
Serafina A. Concannon
CAPLIN & DRYSDALE, CHARTERED
1200 New Hampshire Avenue NW, 8th Floor
Washington, DC 20036

*Counsel for Appellant Official Committee of Talc Claimants*

Rex W. Manning
Joseph M. Capobianco
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004

Michael D. Sirota
Warren A. Usatine
Felice R. Yudkin
COLE SCHOTZ P.C.
25 Main Street, 4th Floor
Hackensack, NJ 07601

5

G. David Dean
COLE SCHOTZ P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801

Seth Van Aalten
Anthony De Leo
COLE SCHOTZ P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019


Paul D. Clement **[ARGUED]**
C. Harker Rhodes IV
Nicholas A. Aquart
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314

> *Counsel for Appellees Whittaker, Clark & Daniels, Inc., Brilliant National Services, Inc., L. A. Terminals, Inc., and Soco West, Inc.*

Seth Goldman
Bradley R. Schneider
Alexis Campbell
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071

Rachel G. Miller-Ziegler
Daniel J. Kane
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001

> *Counsel for Intervenor-Appellees Berkshire Hathaway, Inc., National Indemnity Company, National Liability & Fire Insurance Company, BH Columbia Inc., Columbia Insurance Company, Ringwalt & Liesche Co., and Resolute Management, Inc.*

———————————

OPINION OF THE COURT

———————————

AMBRO, *Circuit Judge*

Plagued by tort liability claims for distributing asbestos-contaminated talc, Whittaker, Clark & Daniels, Inc. ("Whittaker") and its debtor affiliates filed for bankruptcy in 2023 seeking to dispose finally of those claims. Like many mass-tort bankruptcies, counsel contested Whittaker's from the beginning. On appeal, Appellants—the receiver appointed for Whittaker by a South Carolina Court and the Official Committee of Talc Claimants—raise two fundamental questions about Whittaker's bankruptcy: Should we be here at all given that, in their view, Whittaker's petition was improperly filed, and if rightly in bankruptcy, do its assets include certain tort claims relating to asbestos liability?

We conclude that Whittaker properly filed for bankruptcy and the Bankruptcy and District Courts correctly declined to dismiss its petition. We also determine that successor liability claims Appellants seek to assert against a nondebtor belong to the bankruptcy estates rather than individual creditors. Therefore, Whittaker may pursue those claims for the benefit of the estates. Accordingly, we affirm.

## I. BACKGROUND

### A. The Debtors' Corporate History.

Whittaker and its three affiliated debtors—Brilliant National Services, Inc., L.A. Terminals, Inc., and Soco West, Inc. (collectively with Whittaker, the "Debtors")—were processors, manufacturers, and distributors of various industrial chemicals and minerals, including talc. Through a series of corporate transactions—too tortured to recount in full here—the Debtors sold substantially all of their operating assets in 2004 to subsidiaries of Brenntag North America. As part of that transaction, the Debtors ceased to be operating entities, and Whittaker and Soco were left as shell companies to manage asbestos liability from the Debtors' operating businesses. Whittaker, Brilliant, and Soco also took on the obligation to indemnify Brenntag and its affiliates for any liabilities it accrued from asbestos-related tort claims.

Three years later, National Indemnity Company—a subsidiary of Berkshire Hathaway Inc.—acquired Brilliant and L.A. Terminals, thereby indirectly acquiring Whittaker and

Soco.[1]   Through a chain of indemnity agreements and obligations, National Indemnity now backstops asbestos-related successor liability claims against Brenntag.

## B.    Proceedings in South Carolina.

Prior to the Debtors' bankruptcy, plaintiffs across the country filed approximately 2,700 suits against the Debtors for asbestos-related torts.  Our case concerns Sarah Plant's lawsuit in the South Carolina Court of Common Pleas.  The suit followed Plant's diagnosis of mesothelioma (a form of cancer affecting the protective lining of the lungs) from asbestos-contaminated talc produced by Whittaker.  In March 2023, a jury awarded her a $29 million verdict against it.

Days later, Plant moved the South Carolina Court to place Whittaker into receivership.  The Court granted Plant's motion and entered an order (the "Receivership Order" or "Order") appointing Peter Protopapas (the "South Carolina Receiver") as Whittaker's receiver.  The Receivership Order, among other things, vested the South Carolina Receiver "with the power and authority [to] fully administer all assets of [Whittaker], accept service on behalf of [it], engage counsel on behalf of [it] and take any and all steps necessary to protect the interests of [Whittaker] whatever they may be."  Appellants' Consolidated J.A. 217.

Whittaker promptly moved the South Carolina Court to reconsider.  It held a hearing on Whittaker's motion, during

---

[1] National Indemnity assigned its acquisition rights to another Berkshire affiliate, Ringwalt & Liesche Co., who is now the Debtors' ultimate parent.

9

which, in response to counsel's suggestion that Whittaker had the "authority to enter into voluntary bankruptcy," the Court stated:

> I'm well aware, that was the main factor in my signing the order so quickly is that I wanted to be sure that something other than [a] kind of amorphous organization I wasn't quite sure about in terms of asset picture, control[,] or anything else[,] would not simply declare bankruptcy and that entity would still be controlling things. I wanted a receiver that I knew would take it seriously, to look at the asset picture and see what was going on.

*Id.* at 423. The Court denied Whittaker's motion and directed the parties to submit a proposed form of order to memorialize its ruling.

### C.    The Debtors Petition for Bankruptcy.

The Debtors soon thereafter filed for bankruptcy in the United States Bankruptcy Court for the District of New Jersey. Whittaker's board passed a resolution beforehand authorizing the filing without gaining the approval of the South Carolina Receiver or consulting him. He promptly moved in the Bankruptcy Court to dismiss Whittaker's bankruptcy as an unauthorized petition, arguing that the Receivership Order "divested [its] board of the authority to approve a bankruptcy filing on [its] behalf and instead gave such authority to the Receiver alone." Appellants' Consolidated Opening Br. 13.

The Bankruptcy Court denied the South Carolina Receiver's motion, concluding that the Receivership Order did not remove the authority of Whittaker's board to file a bankruptcy petition because its terms did not demonstrate the South Carolina Receiver displaced the board. He appealed to the District Court, which affirmed the Bankruptcy Court's ruling for substantially the same reasons. A timely appeal to our Court followed.

Parallel with the South Carolina Receiver's appeal, Whittaker's bankruptcy proceeded in the Bankruptcy Court. In light of the substantial talc-related asbestos liability the Debtors face, the United States Trustee appointed the Official Committee of Talc Claimants (the "Committee") to represent that constituency's interests during the bankruptcy proceedings.

In September 2023, the Debtors began an adversary proceeding—naming as defendants Brenntag, related entities, and hundreds of individual talc plaintiffs—seeking a declaratory judgment that successor liability claims against Brenntag premised on a "product line" theory of liability[2] (the "Successor Liability Claims") are property of the Debtors' estates

---

[2] The "product line" theory of liability "imposes strict liability for injuries caused by defects of a product line on a corporation that acquires the manufacturing assets of another corporation and undertakes essentially the same manufacturing operation and practices." Appellant Committee's Opening Br. 33 (citing *Ramirez v. Amsted Indus., Inc.*, 431 A.2d 811, 820 (N.J. 1981)).

11

under 11 U.S.C. § 541(a)(1).[3] The Committee intervened in the adversary proceeding, and the Debtors moved for summary judgment. In their briefing, the Debtors argued that our decision in *In re Emoral*, 740 F.3d 875 (3d Cir. 2014), requires treating the Successor Liability Claims as property of the Debtors' bankruptcy estates.

After rounds of unsuccessful mediation, in August 2024 the Bankruptcy Court granted summary judgment to the Debtors. It agreed that, under *Emoral*, the Committee's Successor Liability Claims are property of the Debtors' estates and alternatively held that 11 U.S.C. § 544(a)(1) provides an additional basis for drawing those claims into the estates.[4] Recognizing

---

[3] In the Bankruptcy Court, the Committee distinguished between claims premised on the "product line" theory generally and those claims governed by California law. The latter, the Committee contended, cannot be property of the estate because the "Debtors are precluded by California law from bringing successor liability claims against Brenntag." *In re Whittaker, Clark, & Daniels*, 663 B.R. 1, 12 (Bankr. D.N.J. 2024). As the "California Claims" comprise a subset of the Successor Liability Claims, and the parties place no meaningful significance on the distinction between the two on appeal, we refer simply to the Successor Liability Claims.

[4] Section 544(a) vests a trustee with the rights and powers of a hypothetical lien creditor who extended credit at the time of the debtor's petition, and under 11 U.S.C. § 1107(a), a debtor in a Chapter 11 case (technically called a debtor in possession) has essentially the rights of a trustee ordered to be appointed by the bankruptcy court. Hence here the Debtors' rights are coextensive with those of a trustee.

the uncertainty of the law governing its decision, the Bankruptcy Court certified its decision for direct appeal to our Court under 28 U.S.C. § 158(d)(2). The Committee timely sought a direct appeal, and we granted its petition to do so on December 2, 2024. Given the Receiver's pending appeal and the importance of the issues raised in the Committee's appeal, we ordered expedited briefing and consolidated the two. We now consider both appeals together.[5]

## II.    JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b), and in the South Carolina Receiver's appeal the District Court had jurisdiction under 28 U.S.C. § 158(a). We have jurisdiction under 28 U.S.C. § 158(d). We review without deference both the Bankruptcy Court's and the District Court's legal conclusions, while our review of their factual findings is for clear error. *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998).

## III.    DISCUSSION

---

[5] In the meantime, the Debtors have sought approval from the Bankruptcy Court to settle the Successor Liability Claims for approximately $535 million. That settlement amount includes $50 million in debtor-in-possession financing provided by Berkshire Hathaway, which the Bankruptcy Court approved on October 15, 2024. The Bankruptcy Court held a trial the week of March 3, 2025, on, *inter alia*, the Debtors' settlement motion. A decision remains pending.

Before us are two issues, each with accompanying nuance. First, the South Carolina Receiver and the Committee contend that Whittaker improperly filed for bankruptcy because the South Carolina Court vested that authority exclusively in the South Carolina Receiver, meaning Whittaker's bankruptcy must be dismissed. Second, the Committee argues that the Bankruptcy Court incorrectly concluded that the Successor Liability Claims belong to the Debtors' bankruptcy estates under our decision in *Emoral*. We review each in turn.

### A.    A Properly Filed Petition Is Not a Jurisdictional Prerequisite.

Before considering whether Whittaker properly entered bankruptcy, we encounter a predicate question: Does a properly filed petition affect a court's subject matter jurisdiction? Or is a valid petition instead a non-jurisdictional—but nonetheless integral—component of a bankruptcy case? We conclude it is the latter.

The Bankruptcy Code provides that, except in narrow circumstances, "on request of a party in interest, and after notice and a hearing, the court shall . . . dismiss a case under [Chapter 11] . . . for cause." 11 U.S.C. § 1112(b)(1). "Cause" typically includes things like "gross mismanagement of the estate," "failure to comply with an order of the court," and "material default by the debtor with respect to a confirmed plan." *Id.* § 1112(b)(4)(B), (E), (N). But it also includes occasions when a debtor "did not have the proper authority to commence the . . . bankruptcy proceeding." *In re 3P Highstown, LLC*, 631 B.R. 205, 209 (Bankr. D.N.J. 2021). In those cases, the court "has no alternative but to dismiss the petition." *Price v. Gurney*, 324 U.S. 100, 106 (1945).

The Supreme Court previously described this necessary component of the bankruptcy case as a limitation on courts' "jurisdiction," stating, in interpreting the predecessor statute to the Bankruptcy Code, "nowhere is there any indication that Congress bestowed on the bankruptcy court *jurisdiction* to determine that those who in fact do not have the authority to speak for the corporation . . . should be empowered to file a petition on behalf of the corporation." *Id.* at 107 (emphasis added).

"Jurisdiction," however, "is a word of many, too many, meanings." *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)). And some courts have taken *Price*'s mention of "jurisdiction" to mean a limitation on bankruptcy courts' subject matter jurisdiction. *See, e.g.*, *In re Parks Diversified, L.P.*, 661 B.R. 401, 415–420 (C.D. Cal. 2024) (collecting cases); *In re Mach I Aviation, Inc.*, No. 10-01225, 2011 WL 5838520, at *4 n.11 (B.A.P. 9th Cir. Sept. 15, 2011). Following that understanding, the absence of a properly filed petition would extinguish "a court's power to hear a case," leaving it no choice but to dismiss it for lack of jurisdiction. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)).

But in recognition of jurisdictional limitations' "unique potential to disrupt the orderly course of litigation," recent Supreme Court cases exercise greater care before hanging the "jurisdictional label" on a statutory provision. *Wilkins v. United States*, 598 U.S. 152, 157–58 (2023). Today the standard for concluding a statute limits federal courts' subject matter jurisdiction is an exacting one. While Congress need not employ

any specific formulation or "incant magic words," "the 'traditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences.'" *Boechler, P.C., v. Comm'r*, 596 U.S. 199, 203 (2022) (first quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 154 (2013); then quoting *United States v. Kwai Fun Wong*, 575 U.S. 402, 410 (2015)). Anything short of a clear indication will not do.

The statutes granting federal courts jurisdiction over bankruptcy cases do not attach jurisdictional significance to the propriety of a debtor's petition. The governing provision, 28 U.S.C. § 1334(a), provides only that, absent exceptions not relevant here, "the district courts shall have original and exclusive jurisdiction of all cases under title 11." In addition, "district court[s] may provide that any or all cases under title 11 . . . shall be referred to the bankruptcy judges for the district" who "may hear and determine all cases under title 11 . . . and may enter appropriate orders and judgments." *Id.* § 157(a), (b)(1). These statutes establish the jurisdictional grant for district and bankruptcy courts over bankruptcy cases, and neither they, nor any other provision, condition that grant on a properly filed petition.

Code § 301(a), which does deal with bankruptcy petitions, provides only that a voluntary bankruptcy "is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter." This provision focuses on the commencement of a bankruptcy case by a *debtor*, not on the power to decide of the *court*. Simply put, § 301(a) "does not speak in jurisdictional terms," *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982), and we "will not lightly apply" the jurisdictional label

to a provision absent a "clear statement" to the contrary, *Wilkins*, 598 U.S. at 158.

Accordingly, an improperly filed bankruptcy petition constitutes "cause" to dismiss a bankruptcy case, 11 U.S.C. § 1112(b)(1), but it does not strip bankruptcy courts of subject matter jurisdiction.

### B.    Whittaker Properly Filed Its Bankruptcy Petition.

The Supreme Court has long held that, "[i]n the absence of federal incorporation," "local law" governs a corporate debtor's authority to petition for bankruptcy. *Price*, 324 U.S. at 106. As corporations act through agents, "local law" is the non-federal rule that gives a corporation's agents—typically in those circumstances its board of directors—the "authority . . . to act." *Id.* And because "[c]orporations are creatures of state law," *Burks v. Lasker*, 441 U.S. 471, 478 (1979) (quoting *Cort v. Ash*, 422 U.S. 66, 84 (1975)), "it is state law which is the font of corporate directors' powers," *id.* So we look to governing state law to determine the propriety of a corporation's bankruptcy petition. *In re Franchise Servs. of N. Am., Inc.*, 891 F.3d 198, 206 (5th Cir. 2018).

But which state's law governs? More precisely, in a situation such as this, where a South Carolina court has putatively exercised authority over the assets of a New Jersey corporation, do we assess the authority of Whittaker's board to file for bankruptcy with reference to New Jersey or South Carolina law?

17

Fortunately, the parties make answering this question easy. They agree that New Jersey law governs the authority of Whittaker's board over its internal affairs, like petitioning for bankruptcy. Appellants' Second Supp. Br. 1; Appellees' Second Supp. Br. 2, 11; *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 317 (3d Cir. 2014) (where parties do not dispute governing law, we need not conduct a choice-of-law analysis). So the question becomes whether, under New Jersey law, the Receivership Order stripped Whittaker's board of the authority to file for bankruptcy. It did not.

While we stand far removed in time from the zenith of equity receiverships in this country, *see* David A. Skeel, Jr., *Debt's Dominion: A History of Bankruptcy Law in America* 56–60 (2001) (describing the rise of equity receivership in the late nineteenth century as a device for resolving corporate insolvency), this case proves that state courts retain the traditional equitable authority to appoint receivers for insolvent corporations. But that authority is not without limits, as this case also proves.

New Jersey law recognizes that "comity requires that [a foreign receiver] should be acknowledged and aided" to the extent that doing so is not "to the disadvantage of creditors resident [in New Jersey]." *Stone v. N.J. & H. R. Ry. & Ferry Co.*, 66 A. 1072, 1073 (N.J. 1907). So where a foreign court appoints a receiver, New Jersey courts generally "will appoint an ancillary receiver, [and] the assets will be so administered that creditors in [New Jersey] and in the foreign jurisdiction shall fare alike." *Id.*; *accord Clark v. Painted Post Lumber Co.*, 104 A. 728, 728 (N.J. Ch. 1918) (recognizing that "after the appointment of the receiver in New York, [an ancillary receiver] was appointed" by a New Jersey court); *Ware v. Supreme*

18

*Sitting of Order of Iron Hall*, 28 A. 1041, 1043 (N.J. Ch. 1894) (recognizing that an ancillary receiver was appointed in New Jersey and "should be regarded as auxiliary to the [foreign] receiver").

New Jersey law authorizes its Superior Court to appoint receivers for New Jersey corporations. *See* N.J. Stat. Ann. § 14A:14-2(3) ("The court . . . shall have power to appoint and remove one or more receivers of the corporation."). That provision also permits the court to "enjoin the corporation, its officers and agents, from exercising any of its privileges and franchises, and from collecting or receiving any debts, or paying out, selling, assigning or transferring any of its property, except to a receiver, and except as the court may otherwise order." *Id.* This statute suggests that New Jersey has licensed its courts to exercise broad authority over domestic corporations consistent with its corporate law. Thus, on our reading, New Jersey law permits its courts to recognize foreign receivership orders and appoint an ancillary receiver to aid in the execution of foreign judgments, including by enjoining the corporation and its board from taking specific actions and exercising specific powers.

The Restatement (Second) of Conflict of Laws supports as much. In recognizing that courts may appoint a receiver over a foreign corporation, the Restatement observes that "[w]hen a principal receiver of a corporation has been appointed by a court of a state other than the state of incorporation, and it is intended to dissolve the corporation . . . , an ancillary receiver should be appointed for those purposes by a court of the state of incorporation." Restatement (Second) of Conflict of Laws § 367 cmt. d (Am. L. Inst. 1971). This is so because "only a receiver appointed by a court in the state where

the corporation was incorporated can institute action to dissolve a corporation."[6] *Id.*

Accordingly, under New Jersey law and settled choice-of-law principles, the South Carolina Receiver needed to move for, and be granted, recognition in New Jersey and the appointment of an ancillary receiver to displace Whittaker's board's control over, *inter alia*, the company's privileges, franchises and assets. It did not do so, meaning Whittaker's board retained authority over those corporate decisions reserved to it by New Jersey law, including the decision whether to reorganize by filing for bankruptcy.

Appellants respond by invoking one of our Nation's oldest laws—the Full Faith and Credit statute, 28 U.S.C. § 1738. They contend that, under obligations imposed by that provision, "New Jersey would not ignore the Receivership Order, just as the Bankruptcy Court could not ignore it." Appellants' Second Supp. Br. 6–7. This argument falters on three fronts.

---

[6] Of course, neither New Jersey law nor the Restatement contemplates a state's authority over domestic corporations in instances of bankruptcy, as that power is an area of exclusive federal competence. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 187 (1902) ("The framers of the Constitution . . . granted plenary power to Congress over the whole subject of 'bankruptcies.'"). But the scenarios these authorities posit are sufficiently analogous in character to bankruptcy—in that they involve fundamental changes to a corporation's structure (or, in the instance of dissolution, existence)—that their precepts apply to the same extent when a board seeks to enter bankruptcy.

First, on its face, the Receivership Order does not reach as far as Appellants insist. Rather than extending to displace Whittaker's board's authority over corporate affairs, it purports only to give the South Carolina Receiver control of Whittaker's "assets" and the power and authority to "take any and all steps necessary to protect the interests of [Whittaker] whatever they may be." Appellants' Consolidated J.A. 217. Nowhere does the Order speak to Whittaker's corporate affairs, including the board's authority under New Jersey law to decide whether to file for bankruptcy.[7] And in the absence of anything to the contrary in it, the default rule discussed above controls— namely, Whittaker's board controls the entity's corporate affairs, subject to lawful displacement under New Jersey law. Thus, because the Receivership Order on its own terms does not dictate the result Appellants assert, affording it full faith and credit under § 1738 does not lead to a different outcome.

Second, even if we assume the Receivership Order extended to corporate affairs, Appellees still did not attempt to

---

[7] Appellants have also argued that this type of interpretation is effectively an appeal of the Receivership Order and thus barred by the *Rooker-Feldman* doctrine, which essentially prohibits federal courts, save the Supreme Court, from reviewing final state court judgments. But if an order is interlocutory, the *Rooker-Feldman* doctrine applies only to those that are "effectively final" because, among other things, the parties have abandoned further litigation. *Cf. Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 459 (3d Cir. 2019). And here, state-court litigation over the Order is not abandoned—it is merely stayed. *See* 11 U.S.C. § 362(a). Indeed, Appellants expressed their intention to continue to litigate the Order if the stay were lifted.

enforce it against Whittaker.  While an order rendered by a foreign court may warrant recognition and enforcement under § 1738, "[e]nforcement measures do not travel with the sister state judgment," and full faith and credit "does not mean that States must adopt the practices of other States regarding the time, manner, and mechanisms for enforcing judgments." *Baker ex rel. Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 235 (1998).  So even spotting Appellants the enforceability of the Order, they needed to employ the enforcement mechanisms provided under New Jersey law outlined above, which they did not do (e.g., not securing the appointment of an ancillary receiver in New Jersey),[8] meaning their § 1738 argument fails on this basis too.

Third, and more fundamentally, were the South Carolina Court to issue an order purporting to place the control of Whittaker's corporate affairs in the hands of the South Carolina Receiver, we doubt its ability to do so.  Our system of federalism embodies "the fundamental principle of equal sovereignty" among the states.  *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).  Implicit in that foundational

---

[8] The Receiver contends that he should not have been required to seek appointment of an ancillary receiver in New Jersey because Whittaker "itself made [doing so] impossible" by "filing for bankruptcy before the South Carolina Court could even issue a written order memorializing its denial of [Whittaker]'s motion for reconsideration," characterizing Whittaker's position as "Kafka-esque."  Appellants' Consolidated Reply Br. 21.  But without an order lawfully preventing it from doing so, Whittaker's board was free to exercise its authority under New Jersey law to enter bankruptcy.  The fact that the Receiver lost the race to the courthouse does not render the results invalid.

22

organization of co-equal sovereigns is "the usual legislative power of a State to act upon persons and property within the limits of its own territory," permitting "different communities to live with different local standards." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023) (cleaned up).

But states' power to exercise control over actors within their respective borders is not without limits. Indeed, the Constitution has a great deal to say about the relations between states, their authority to decide the rights of foreign parties, and the application of their laws in instances of conflict. For instance, the Due Process Clause of the Fourteenth Amendment is long understood to impose limitations on state courts' authority to determine non-resident parties' rights. *See, e.g.*, *Pennoyer v. Neff*, 95 U.S. (5 Otto) 714, 723–43 (1877); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 323–24 (1945); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980); *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). Likewise, the dormant Commerce Clause prohibits, among other things, "the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Ross*, 598 U.S. at 369 (omission in original) (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 337–38 (2008)).

So it is no surprise that the Constitution limits the authority a state court can exercise over a corporation incorporated in a sister state. Those limitations are as intuitive as they make good sense. A corporation's state of incorporation or

23

principal place of business determines its domicile.[9] *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). And domicile has long carried with it great significance for states' authority. *See id.*; *Pennoyer*, 95 U.S. at 723. Among the many powers over their domiciliaries, states may determine "'any and all claims' brought against a [resident] defendant." *Ford Motor Co.*, 592 U.S. at 358 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). But "the very nature of the federal union of states, to which are reserved some of the attributes of sovereignty, precludes resort to the full faith and credit clause as the means for compelling a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n*, 306 U.S. 493, 501 (1939). Thus, when it comes to control over corporate decision-making, a state "has no interest in regulating the internal affairs of foreign corporations." *Edgar v. MITE Corp.*, 457 U.S. 624, 645–46 (1982).

But as Appellants would have it, that is precisely what the South Carolina Court did in this case. They contend that the Receivership Order, properly construed, "divest[ed]" Whittaker's board of authority to conduct the internal affairs of the

---

[9] Whittaker's principal place of business is in Connecticut. We take no position on the authority a state in which a corporation has a principal place of business may exert over that corporation when it is incorporated in a different state. Neither party has argued that Connecticut is the proper forum to enforce the Receivership Order or that its law governs. Accordingly, we limit our discussion to New Jersey and South Carolina laws, as the parties have framed this case.

corporation—including the authority to file for bankruptcy.[10] Oral Arg. Tr. 15:17. As explained above, the Order, reasonably interpreted, does not extend so far. And if it did, it would be an unprecedented exertion of power over a foreign corporation whose internal affairs are governed by the laws of a sister state, and a radical intrusion into the province of a co-equal sovereign.

These constitutional infirmities provide an independent basis to reject Appellants' appeal to § 1738. Rendering full faith and credit to foreign judgments does not entail blind deference in the face of constitutional limitations. Just as "[a] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, . . . other state and federal courts are not required to accord full faith and credit to such a judgment." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982) (footnote omitted). So where, as here, the parties did not litigate the constitutionality of the state-court judgment, § 1738 does not require New Jersey to acquiesce in the enforcement of the Receivership Order without assessing its (doubtful) constitutionality.

\* \* \* \* \*

---

[10] Appellants seemingly take the position that the Receivership Order did far more than merely attempt to prevent Whittaker from filing for bankruptcy. At oral argument, when asked whether, in their view, the Receivership Order authorized the South Carolina Receiver "to amend the bylaws of the corporation, to enter into mergers," or to "[c]hange domicile," counsel for Appellants neither disavowed those actions nor offered a limiting principle for their interpretation of the Order. Oral Arg. Tr. 14:1–3.

"Our Constitution 'was framed upon the theory that the peoples of the several states must sink or swim together.'" *Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935)).  But while bound together in a federal union, certain powers are reserved to states' respective provinces to the exclusion of sister states.  Among others, the state of incorporation enjoys the exclusive authority to govern the internal affairs of its corporations.  Thus, consistent with constitutional constraints, New Jersey law governs and sanctions the Whittaker board's authority to petition for bankruptcy. And in any event, the Receivership Order did not purport to divest that body of the authority to seek bankruptcy protection, as the Bankruptcy and District Courts correctly concluded.

## C.    Successor Liability Claims Are Property of the Debtors' Estates.

As Whittaker properly entered bankruptcy, we now turn to consider whether the Successor Liability Claims belong to the Debtors' estates.  We conclude they do.

At the outset of a bankruptcy case, Code § 541(a)(1) establishes an estate comprised of "all legal or equitable interests of the debtor in property," including causes of action, "wherever located and by whomever held."  This feature of bankruptcy law can have significant repercussions, for "once a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory

26

authority to pursue it."[11] *In re Wilton Armetale, Inc.*, 968 F.3d 273, 280 (3d Cir. 2020).  So whether a claim is in or out of the estate determines who can pursue (and recover on) that claim—a difference, as this case demonstrates, with significant consequences.

In order for a claim putatively held by a creditor to belong to the estate, two conditions must be met: (1) it must have existed at the outset of the bankruptcy, and (2) it must be a "general" claim, meaning one "with no particularized injury arising from it." *Emoral*, 740 F.3d at 879 (quoting *Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)).  Whether a claim is "general" to all creditors or "personal" to a specific creditor calls for an "examin[ation of] the nature of the cause of action itself." *Id.*  In doing so, "we focus not on the nature of the injury, but on the 'theory of liability.'" *Wilton Armetale*, 968 F.3d at 282 (quoting *Emoral*, 740 F.3d at 879).

"General" claims are ones "based on facts generally available to any creditor, and [for which] recovery would serve to increase the pool of assets available to all creditors." *Emoral*, 740 F.3d at 881.  Contrast this with "personal" claims, which are "specific to the creditor" and in which "other creditors generally have no interest." *Id.* at 879 (quoting *Foodtown*, 296 F.3d at 170).  A claim is "personal" when the creditor's injury can be "directly traced" to wrongful conduct committed by the defendant, whether that be the debtor or a third party.

---

[11] As mentioned already, *supra* note 4, in Chapter 11 cases (where there is seldom a trustee) the debtor in possession enjoys "all the rights . . . and powers . . . of a trustee," save for exceptions not relevant here.  11 U.S.C § 1107(a).

*Wilton Armetale*, 968 F.3d at 283 (quoting *In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir. 2017)). A claim is "general" if the creditor's theory of liability depends on facts concerning the relationship between the defendant and another party—that is, "facts generally available to any creditor." *Emoral*, 740 F.3d at 881.

In *Emoral*, we applied this standard to a case that shares many similarities with this one. The debtor (Emoral) manufactured diacetyl, a chemical used in the food flavoring industry that was later found to cause various lung ailments. *Id.* at 877. Through a complicated procedural history, a group of plaintiffs eventually sued Aaroma Holdings LLC—a company that bought some of Emoral's assets and assumed some of its liabilities in the bankruptcy case—for diacetyl-related injuries they suffered from Emoral's products. *Id.* The plaintiffs proceeded against Aaroma on the theory that it was the "mere continuation" of Emoral and thus liable for the plaintiffs' diacetyl-related personal injury and product liability claims as Emoral's successor. *Id.*

We held that the plaintiffs' successor liability claims against Aaroma were "general" claims and belonged to Emoral's bankruptcy estate rather than individual creditors. *Id.* at 880. Because they had not alleged "any direct injury" caused to them by Aaroma, the plaintiffs "fail[ed] to demonstrate how any of the factual allegations" were "unique to them as compared to other creditors of Emoral." *Id.* at 879–80. While the plaintiffs "focus[ed] on the individualized nature of their personal injury claims against Emoral," the same could not be said about their claims against Aaroma. *Id.* at 879. Their only theory of liability as to those claims depended on Aaroma's status

as Emoral's successor, not its relationship with or conduct toward the plaintiffs.

This case mirrors *Emoral*, and that sounds the death knell for the Committee's argument.[12]  Start from the beginning:  The Committee's theory of liability against Brenntag depends exclusively on the latter's relationship with the Debtors, not on any interaction with the individual claimants themselves.  It attempts to hold Brenntag liable under a "product line" tort theory, which, to repeat note 2 above, "imposes strict liability for injuries caused by defects of a product line on a corporation that acquires the manufacturing assets of another corporation and undertakes essentially the same manufacturing operation and practices."  Appellant Committee's Opening Br. 33.  While that theory of liability is distinct from the "mere continuation" theory advanced in *Emoral*, the Committee here—just as the plaintiffs in *Emoral*—seeks to impose the Debtors' liability onto Brenntag solely due to its status as the Debtors' successor, not because of any "particularized injury that can be 'directly traced' to [its] conduct." *Wilton Armetale*, 968 F.3d at 283 (quoting *Tronox*, 855 F.3d at 100).  So the Successor Liability Claims against Brenntag belong to the Debtors' estates, meaning they are for the Debtors to pursue or settle, not the Committee.

The Committee challenges this logic on two fronts.  It contends that "[t]he absence of an independent right under state

---

[12] All agree the Successor Liability Claims existed as of the Debtors filing bankruptcy, so *Emoral*'s first prong is satisfied and we focus on the second.  *See* Appellant Committee's Opening Br. 25 (not disputing this element); Appellees' Answering Br. 20.

law for the Debtors to bring on their own behalf at least a subset of the Successor Liability Claims . . . demonstrates that the Debtors cannot satisfy the first part of the *Emoral* test." Appellant Committee's Opening Br. 32 (quoting *Emoral*, 740 F.3d at 879). For this assertion, the Committee calls out language from a footnote in *Foodtown* that "[a] cause of action is considered property of the estate if [1] the claim existed at the commencement of the filing and [2] the debtor could have asserted the claim on his own behalf under state law." 296 F.3d at 169 n.5 (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)). From this statement, the Committee seeks to add a third prong to that property-of-the-estate test, namely that a debtor must have a state cause of action to assert before filing for bankruptcy in order for a claim to be property of the estate.

But this argument divines too much from too little. Elsewhere in *Foodtown* itself, we recited the now-familiar standard noted above governing when claims become property of the estate: "In order for the claim to be the 'legal or equitable interest of the debtor in property,' the claim must be a 'general one, with no particularized injury arising from it.'" *Id.* at 170 (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)). We reiterated that test in both *Emoral* and *Wilton Armetale*, *see* 740 F.3d at 879 & 968 F.3d at 282, and neither time did we impose an additional, freestanding condition that a debtor be able to pursue the cause of action under state law for it to become property of the estate. So while the ability to "assert[] the claim on his own behalf under state law" is enough to become property of the estate, it is not necessary. *Foodtown*, 296 F.3d at 169 n.5. Thus, any inability by the Debtors to assert the Successor Liability Claims against

30

Brenntag outside of bankruptcy does not affect whether those claims are property of the estate inside bankruptcy.[13]

The Committee also argues that the Successor Liability Claims are not "general" because the theory of liability against Brenntag (the product-line theory) involves "specific claims exclusively belonging to victims injured by defective products," and "[t]hey arise from harms unique to those victims . . . based on conduct of the successor entity." Appellant Committee's Opening Br. 33. Those claims do not inure to the benefit of all creditors, the Committee asserts, because they are only available to "personal-injury and environmental tort creditors; they do not include, for example, the Debtors' various commercial and contract creditors." *Id.* at 36.

While this argument may have intuitive appeal, our precedent has already rejected it. When assessing whether a claim is "general" or "personal," we "focus not on the nature of the injury, but on the 'theory of liability.'" *Wilton Armetale*, 968 F.3d at 282 (quoting *Emoral*, 740 F.3d at 879). As the Committee presses a "product line" theory, we evaluate whether the facts necessary to establish liability under *that theory* are "generally available to any creditor." *Emoral*, 740 F.3d at 881.

---

[13] In *Emoral* we expressed doubt that such an inability made a difference to whether a claim was properly characterized as "general." 740 F.3d at 881 ("As a practical matter, it is difficult to imagine a factual scenario in which a solvent Emoral, outside of the bankruptcy context, would or could bring a claim for successor liability against Aaroma.").

31

The product-line theory depends entirely on the successor's relationship with the manufacturer because it is the successor's acquisition and continuation of the "same manufacturing operation and practices" as the manufacturer that seeds potential successor liability to individual claimants. Appellant Committee's Opening Br. 33 (citing *Ramirez*, 431 A.2d at 820). That sort of pass-through liability—using the manufacturer as a conduit to reach the successor—was rejected in *Emoral* because the facts on which liability depended—the successor's relationship with the manufacturer—do not implicate a claim that is "specific to the creditor." *Emoral*, 740 F.3d at 879 (quoting *Foodtown*, 296 F.3d at 170).

So too here. The talc claimants' injuries do not stem from the nucleus of facts that underlay Brenntag's status as a successor to the Debtors. They trace only to the exposure to asbestos-contaminated products manufactured by the Debtors at a time before Brenntag was even in the picture. This obviates their being "directly traced" to it. *Wilton Armetale*, 968 F.3d at 283 (quoting *Tronox*, 855 F.3d at 100). Those claims are quintessentially "general."[14]

---

[14] At oral argument, the Committee gestured at the prospect of conceiving its constituents' claims as "direct" and stemming from Brenntag's own conduct, namely its status as "a successor who continues to manufacture the product." Oral Arg. Tr. 77:6–7. But this characterization merely repackages the product-line theory and runs into the same problems. True, the Committee's product-line claims depend, in some measure, on Brenntag's conduct. In order to be a successor susceptible to the product-line theory, Brenntag must have actually continued the product line, which it has. But that fact was equally present

To be sure, the Committee correctly points out that its constituents have each suffered "harms unique to [them]." Appellant Committee's Opening Br. 33. Indeed, this echoes arguments raised in the *Emoral* dissent, which would have held that "[b]ecause the Diacetyl Plaintiffs' underlying allegations are clearly individualized in nature, their claims against Aaroma—which seek to hold this third party liable for their alleged injuries as the 'mere continuation' of Emoral—must also be considered as individualized claims." *Emoral*, 740 F.3d at 883 (Cowen, J., dissenting). The *Emoral* majority, however, rejected that focus on "the nature of the [underlying] injury," instead returning to consideration of "the 'theory of liability'" and the facts on which it relies. *Wilton Armetale*, 968 F.3d at 282 (quoting *Emoral*, 740 F.3d at 879). And that analysis controls even though the harm suffered by some creditors "might be worse in degree than that suffered by other[s]."[15] *Id.* at 283.

---

in *Emoral*, where the diacetyl plaintiffs' "mere continuation" claims depended in part of Aaroma's purchase of Emoral's assets and continuation of its business enterprise. *Emoral*, 740 F.3d at 880. So while successor liability claims at some level depend on actions by the successor, the injuries to the Committee's constituents cannot be "directly traced" to Brenntag's conduct because they stem from *the Debtors'* manufacture and sale of asbestos-contaminated products. *Wilton Armetale*, 968 F.3d at 283 (quoting *Tronox*, 855 F.3d at 100).

[15] The Bankruptcy Court held in the alternative that § 544(a)(1), coupled with § 541(a)(7), brought the Successor Liability Claims into the Debtors' estates. Section 541(a)(7) provides that "[a]ny interest in property that the estate acquires after the commencement of the case" becomes property of the

## IV.   CONCLUSION

Whittaker filed for bankruptcy after its board exercised its power to authorize the petition.  The South Carolina Court could not divest Whittaker's board of that authority on its own, and, once appointed, the South Carolina Receiver had to move successfully a New Jersey court to displace the board.  That did not occur (indeed, the attempt was not made), and Whittaker properly entered bankruptcy.  Once there, Code § 541(a)(1) and *Emoral* brought the Successor Liability Claims into the Debtors' estates.[16]  For these reasons, we affirm the judgments

---

estate.  So because the debtor in possession enjoys the rights of a trustee under the Code—including the right to pursue estate causes of action, *Wilton Armetale*, 968 F.3d at 282—the Bankruptcy Court reasoned that the post-petition cause of action conferred on the trustee by § 544(a)(1) is after-acquired property of the estate under § 541(a)(7). *See In re Whittaker, Clark, & Daniels*, 663 B.R. at 14.  Thus, because, in the Bankruptcy Court's view, the Successor Liability Claims could be asserted by a trustee under § 544(a)(1), § 541(a)(7) drew those claims into the Debtors' estates.  While the parties have devoted portions of their briefs and arguments to address this alternative holding, we need not consider it because we conclude that our decision in *Emoral* makes the Successor Liability Claims property of the estate under § 541(a)(1).

[16] Supplementing note 5 above, we are aware that the Debtors, having prevailed in the Bankruptcy Court, have moved for approval of a settlement of the Successor Liability Claims with Brenntag, National Indemnity, and others.  Naturally, our conclusion that the Successor Liability Claims are property of

of the District and Bankruptcy Courts.

---

the estate under § 541(a)(1) puts the ball in the Debtors' court, and it is their prerogative to pursue or settle those claims. But we note that the Debtors do not enjoy unbounded discretion. As debtors-in-possession, they owe fiduciary duties to all creditors, including the Committee's constituents, to maximize the value of the estate. *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998). Sometimes the most beneficial course may be to settle claims and avoid the cost and uncertainty of litigation. Other times it may not. For that reason, bankruptcy courts must scrutinize proposed settlements under Bankruptcy Rule 9019 "to determine what course of action will be in the best interest of the estate." *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996). And that scrutiny is "rigorous[]" when the debtor looks to settle with an insider. *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) (quotation omitted). We have no doubt the Bankruptcy Court will evaluate the Debtors' proposed settlement with these precepts in mind.

KRAUSE, *Circuit Judge*, concurring.

I join the majority opinion in full. As it persuasively explains, New Jersey law governs the authority of Whittaker's board to exercise corporate authority, and the South Carolina Court did not—and likely could not—unilaterally divest the board of that authority. Once in bankruptcy, moreover, our decisions in *In re Emoral*, 740 F.3d 875 (3d Cir. 2014), and *In re Wilton Armetale, Inc.*, 968 F.3d 273 (3d Cir. 2020), straightforwardly dictate that the Successor Liability Claims are property of the estate under 11 U.S.C. § 541(a)(1). I write separately, however, to address which choice-of-law rules govern in bankruptcy—an issue that both looms in the background of this case and that has divided courts for decades.

Both parties ultimately agree that New Jersey law governs Whittaker's authority to petition for bankruptcy protection, but they also recognize that there are two distinct paths to that choice of law—the "forum state" rule of *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941), on the one hand, and a federal common law choice of law rule, incorporating the internal affairs doctrine, on the other. Here, because the forum state is New Jersey and because Whittaker is a New Jersey corporation, those paths converge. But, as highlighted in the parties' briefing and argument on this question, each rule involves a different analysis and is capable of producing a different outcome. And confusion about how to resolve this conflict-of-laws question in bankruptcy cases will persist in our Circuit absent guidance from our Court. I write here with an eye towards that eventual resolution. As it turns out, the answer lies in established doctrine. For the reasons explained more thoroughly below, the Bankruptcy Code; *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), and the

1

Rules of Decision Act; and the grant of bankruptcy jurisdiction to federal courts all support employing the choice-of-law rules of the state in which the bankruptcy court sits.

## I.     The Puzzle: Choice of Law in Bankruptcy

Federal courts are most often called on to resolve choice-of-law questions while exercising diversity jurisdiction. In those cases, non-federal law (usually state law) provides the rule of decision, *Erie*, 304 U.S. 64, and diverse parties might dispute which law governs their claims. When those candidate laws conflict, courts must decide which one controls. To answer that question, a federal court sitting in diversity uses the choice-of-law rules of the state in which it sits. *Klaxon*, 313 U.S. at 496.

Our Court has not previously determined whether the same rule applies in bankruptcy proceedings.[1] But some of our sister circuits have entered this fray, coming to differing conclusions. The Eighth Circuit applies *Klaxon* in bankruptcy cases, directing that "bankruptcy court[s] appl[y] the choice of law rules of the state in which it sits," *In re Payless Cashways*, 203 F.3d 1081, 1084 (8th Cir. 2000), and that "when some federal interest requires a different result," the "appropriate question" is not choice-of-law but rather rule of decision, i.e., "whether the state [law] can trump the federal [law]," which it obviously cannot, *In re Schriock Constr., Inc.*, 104 F.3d 200, 201–02 (8th Cir. 1997) (quoting *Butner v. United States*, 440

---

[1] *See In re Abeinsa Holding Inc.*, No. 20-3333, 2021 WL 3909984, at *3 (3d Cir. Sept. 1, 2021) (noting that our Court has "not yet precedentially resolved the choice-of-law rules applicable in bankruptcy proceedings").

2

U.S. 48, 54 (1979)).[2]  The Ninth Circuit (and possibly the Fifth), on the other hand, have rejected *Klaxon* in bankruptcy cases and instead require a federal common law choice-of-law rule.  *See In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995); *Wallace Lincoln-Mercury Co. v. Gentry*, 469 F.2d 396, 400 n.1 (5th Cir. 1972).  *But see Fishback Nursery, Inc. v. PNC Bank, N.A.*, 920 F.3d 932, 935 (5th Cir. 2019) (describing *Klaxon*'s application in bankruptcy as "an open question").  Finally, the Second and Fourth Circuits take a hybrid approach—applying *Klaxon* "in the absence of a compelling federal interest which dictates otherwise." *In re Merritt Dredging Co.*, 839 F.2d 203, 205–06 (4th Cir. 1989); *see also In re Gaston & Snow*, 243 F.3d 599, 607 (2d Cir. 2001) (applying *Klaxon* unless "significant federal policy, calling for the imposition of a federal conflicts rule, exists").  In other words, in contrast to the Eighth Circuit, which would accommodate any overriding federal interest by applying a federal rule of decision, these courts would reach the same result but under the auspices of a choice-of-law rule.

This tripartite circuit split has persisted for decades and created disparities in how bankruptcy courts determine which law governs parties' rights and obligations.  As I explain below, however, there is no basis to depart from the established rule from *Klaxon*, and, consistent with the Eighth Circuit's approach, any conflict-of-laws issue is properly resolved as a matter of rule of decision, not choice of law.

---

[2] To be sure, the Eighth Circuit adopted *Klaxon*'s rule in bankruptcy without much reasoning.  *See In re Payless Cashways*, 203 F.3d at 1084.

3

## II.    The Affirmative Case for Applying Klaxon in Bankruptcy

The reasons for extending *Klaxon* to bankruptcy are many and exceedingly strong. All relate to the structure of the Bankruptcy Code, the purposes the Code serves, and *Erie* and the Rules of Decision Act. I consider them in turn.

First, while bankruptcy provides an "orderly and centralized" process to restructure the debts of the honest but unfortunate debtor, 1 *Collier on Bankruptcy* ¶ 1.01[1] (16th ed. 2025), it does not create substantive property rights. Instead, consistent with the Rules of Decision Act, 28 U.S.C. § 1652, it is non-bankruptcy law that defines parties' property interests,[3] *Butner*, 440 U.S. at 55; *accord In re Boy Scouts of Am.*, 137 F.4th 126, 164 (3d Cir. 2025). Accordingly, courts exercising bankruptcy jurisdiction regularly look to governing non-bankruptcy law—often "state law"—to determine parties' "rights and obligations when the Code does not supply a federal rule." *In re Wright*, 492 F.3d 829, 832 (7th Cir. 2007) (Easterbrook, J.). And in doing so, those courts frequently encounter the same dilemma they do when sitting in diversity: conflicting laws that purport to govern parties' rights and interests.

As bankruptcy law takes parties' property rights as it finds them, *Butner*, 440 U.S. at 55; *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019), the fact

---

[3] While "property" generally conjures images of real property or tangible items, in bankruptcy (and elsewhere), various intangibles, such as causes of action, similarly constitute property. *See, e.g.*, *In re Kane*, 628 F.3d 631, 637 (3d Cir. 2010).

that parties find themselves wound up in a bankruptcy case should not work to alter the law that would otherwise govern their rights, *cf. Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 820 (1985) (rejecting notion that participation in a class action changes the substantive law governing individual plaintiffs' disputes).   But adopting a choice-of-law rule unique to bankruptcy risks just that and would subject identically situated parties to different governing laws simply by virtue of one dispute occurring in bankruptcy court while the other unfolds in run-of-the-mill civil litigation.[4]   Our bankruptcy

---

[4] In addition to diversity cases, *Klaxon* governs choice-of-law questions where jurisdiction is anchored on other bases, including federal questions under 28 U.S.C. § 1331, *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 399 (3d Cir. 1987) (ancillary (now supplemental) jurisdiction); *Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977) ("Although *Klaxon* was a diversity jurisdiction case, the same principle holds true with respect to pendent jurisdiction claims."); *accord Elliott v. Cartagena*, 84 F.4th 481, 496 n.14 (2d Cir. 2023); *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017); *BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999); *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997); *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996); *Sommers Drug Stores Co. Emp. Profit Sharing Tr. v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989); *Bi-Rite Enters., Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir. 1985); *ITCO Corp. v. Michelin Tire Corp., Com. Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983), and interpleader under 28 U.S.C. § 1335, *Griffin v. McCoach*, 313 U.S. 498, 503 (1941). Moreover, outside of federal court, state courts employ the

5

system does not demand—and, indeed, militates against—such a disparity. *See BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544–45 (1994) (absent a clear and manifest conflict, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law"). And nothing in the text of the Code or the statutes granting bankruptcy jurisdiction warrants a departure from the ordinary rule of *Klaxon*. *See* Zachary D. Clopton, *Horizontal Choice of Law in Federal Courts*, 169 U. Pa. L. Rev. 2193, 2212 (2021).

Second, influential bankruptcy scholarship buttresses this conclusion. As renowned scholars have advocated, the bankruptcy system in many ways "mirror[s] the agreement one would expect the creditors to form among themselves were they able to negotiate such an agreement from an *ex ante* position." Thomas H. Jackson, *Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain*, 91 Yale L.J. 857, 860 (1982). This view, coined the "creditors' bargain" theory, conceptualizes bankruptcy's primary role as a means to resolve the collective action problem posed by self-interested creditors who, absent a centralized insolvency resolution system, would engage in individual collection actions under applicable non-bankruptcy law, inefficiently picking the debtor apart and "destroying value for the collective body of creditors." Kenneth Ayotte & David A. Skeel Jr., *Bankruptcy Law as a Liquidity Provider*, 80 U. Chi. L. Rev. 1557, 1564 (2013). Without bankruptcy's centralization, "[a]n unsecured creditor

---

forum's choice-of-law rules, *see* Restatement (Second) of Conflict of L. § 5 cmt. b (A.L.I. 1971) ("A court applies the law of its own state, as it understands it, including its own conception of Conflict of Laws.")—the practice that *Klaxon* aims to mirror.

who seizes the debtor's assets early enough in time, when the debtor has enough to pay, will receive full payment," while "[l]ate-arriving creditors are left out in the cold when the assets are not sufficient to pay the firm's debts." *Id.*

Viewed through this lens, among its other features, bankruptcy facilitates the orderly resolution of competing creditor entitlements that exist under governing non-bankruptcy law. Such a system takes as a given creditors' preexisting property interests and "does not . . . justify the implementation of a different set of relative entitlements, unless doing so is necessary as a part of the move from the individual remedies system" that exists outside of bankruptcy. Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* 21 (1986).

True, the Bankruptcy Code does change parties' "relative entitlements" in some circumstances in aid of debtor rehabilitation. *See, e.g.*, 11 U.S.C. §§ 364(d); 365(e), (i); 502(b); *see also* Daniel J. Bussel et al., *Bankruptcy* 33 (11th ed. 2021). But among the Code's voluminous rules, these

provisions fall in the minority.[5]  And as the creditors' bargain theory advances, non-bankruptcy entitlements generally should endure within bankruptcy, *see* Ayotte & Skeel, *supra*, at 1564–65 ("The second element of the Creditors' Bargain theory is the claim that resolution of common-pool problems may require altering the procedural rights of creditors, but that it typically does not require altering the substantive values of those rights as established by nonbankruptcy law."); *see also* 7 *Collier on Bankruptcy* ¶ 1100.01 (16th ed. 2025) (noting the

---

[5] To be sure, bankruptcy does not have to work this way.  The Constitution reserves to Congress the authority to legislate for "the entire 'subject of Bankruptcies,'" *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 370 (2006) (quoting U.S. Const. art. I, § 8, cl. 4), which encompasses "nothing less than . . . the relations between . . . [a] debtor, and [its] creditors," *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513–14 (1938) (internal quotation marks omitted).  Congress could enact legislation that impairs any number of entitlements created by non-bankruptcy law.  In this way, *Butner* is merely descriptive of the bankruptcy system that Congress has chosen to enact: "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."  440 U.S. at 54.  It does not stand for the proposition that our Nation's bankruptcy laws *cannot* determine parties' relative entitlements, as scholars have pointed out.  *See, e.g.*, Anthony J. Casey, *Chapter 11's Renegotiation Framework and the Purpose of Corporate Bankruptcy*, 120 Colum. L. Rev. 1709, 1751 (2020) (advancing a theory of Chapter 11 that "support[s] a soft version of *Butner*" positing that, "[i]n the absence of any evidence of hold up, nonbankruptcy provisions should remain intact . . . simply because in the absence of hold up there is no role for bankruptcy law").

importance of "preserv[ing] creditors' and stakeholders' existing legal rights to the greatest extent possible"), counseling in favor of adopting *Klaxon* to preserve parity with parties' pre-bankruptcy positions vis-à-vis one another.

Third, extending *Klaxon* to the bankruptcy context is fully consistent with—and supported by—*Erie* and the Rules of Decision Act. *Klaxon* is a product of *Erie*, which announced "[t]here is no federal general common law." 304 U.S. at 78. Instead, where federal law does not govern, "[t]he laws of the several states" are "regarded as rules of decision . . . in cases where they apply." 28 U.S.C. § 1652. While *Erie* itself was a diversity case, it "reflects the principle now well established that federal courts should apply state law to legal issues, unless there is some definable federal interest sufficient to justify applying corresponding and possibly inconsistent federal rules of decision." 19 Wright & Miller's Federal Practice & Procedure § 4520 (3d ed. May 2025 update). *Klaxon* reflects the same principle, for "[a] choice-of-law rule is no less a rule of state law than any other." *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1464 (D.C. Cir. 1995); *see also* Russell J. Weintraub, *The* Erie *Doctrine and State Conflict of Laws Rules*, 39 Ind. L.J. 228, 242 (1964) ("[T]he choice-of-law rules of a state are important expressions of its domestic policy."). Thus, it would seem that wherever *Erie* travels, *Klaxon* ought to follow. *See* Clopton, *supra*, at 2198 ("In short, *Klaxon* all the way down.").

In the bankruptcy arena, the Bankruptcy Code supplies the federal rules of decision that Congress has deemed necessary to effectively govern the relationship between the debtor and its creditors. Even a cursory review of the Code's "hundreds of interlocking rules," *Harrington v. Purdue*

9

*Pharma L.P.*, 603 U.S. 204, 209 (2024), reveals that Congress took care to include many provisions that aim "to protect [] national" interests, *In re Trib. Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 94 (2d Cir. 2019); *see, e.g.*, 11 U.S.C. §§ 362(a) (automatic stay of collection of prepetition debts, including state-court litigation); 365(e) (invalidating *ipso facto* clauses); 546(e) (safe harbor for certain pre-petition securities transactions); 555–56, 559–61 (protections for post-petition securities, commodities, repurchase, swap, and netting transactions); 1110 (providing preferred rights to aircraft and vessel lessors).

As these provisions illustrate, Congress identified and manifested in the Code the specific federal interests it wished to protect; it did not leave readers to divine untold rules from some brooding cloud of federal interests hanging over bankruptcy. As we invariably do when construing federal statutes, we look to its text to discern meaning, *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 375 (3d Cir. 2022), and we "presume that [Congress] says in a statute what it means and means in a statute what it says," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). So while "the Bankruptcy Clause confers broad authority on Congress," *Siegel v. Fitzgerald*, 596 U.S. 464, 476 (2022), to establish "uniform Laws on the subject of Bankruptcies," U.S. Const. art. I, § 8, cl. 4, Congress has not dictated a particular choice-of-law rule to govern in bankruptcy cases.

This is a glaring omission in a sea of provisions relating to bankruptcies and not one we should presume Congress simply overlooked. To the contrary, we must respect the presumption that state law governs "until Congress strikes a different accommodation." *United States v. Kimbell Foods,*

10

*Inc.*, 440 U.S. 715, 740 (1979).  It is not the role of federal courts to extend federal interests beyond those Congress has prescribed. *See Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981); *In re One2One Commc'ns, LLC*, 805 F.3d 428, 444 (3d Cir. 2015) (Krause, J., concurring); *cf. Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 116 (2022) (concluding that, when an exception to foreign sovereign immunity applies under the Foreign Sovereign Immunities Act, federal courts must apply *Klaxon* because the statute already protects the unique federal interest of foreign relations).  Instead, "the issue of whether to displace state law . . . is primarily a decision for Congress," *Miree v. Dekalb Cnty.*, 433 U.S. 25, 32 (1977), and "[w]e should not assume that Congress intended to set the courts completely adrift from state law with regard to questions for which it has not provided a specific and definite answer in an act . . . so intimately related to state law," *Richards v. United States*, 369 U.S. 1, 11 (1962). In these circumstances, with a "federal statutory regulation [so] comprehensive and detailed," the usual rule applies that "matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law," negating the need to "adopt a court-made rule to supplement" the Code. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994).

Accordingly, there is no need to craft a choice-of-law rule unique to bankruptcy to preserve some "undefined federal

11

interests" that do not appear in the Code.[6] *CoreCivic, Inc. v. Governor of N.J.*, No. 23-2598, 2025 WL 2046488, at *10 (3d Cir. July 22, 2025) (Ambro, J., dissenting). Rather, when a provision of the Bankruptcy Code governs, the Supremacy Clause obviates any choice-of-law analysis, for federal law always trumps conflicting state law. U.S. Const. art. VI, cl. 2; *see also infra* Section IV. And when the Code or other federal law does not supply the rule of decision, the Rules of Decision Act commands that governing non-federal law fills the gap. 28 U.S.C. § 1652. Outside of bankruptcy, that means *Klaxon* controls, and nothing about the bankruptcy context warrants departing from that rule.

Of course, *Erie*, and consequently *Klaxon*, arose in the context of diversity jurisdiction, so the extension of the policies those cases embody to other contexts is not obvious. And that uncertainty has caused some of our sister circuits to either reject *Klaxon* in bankruptcy cases or hedge on its application. *See, e.g.*, *In re Lindsay*, 59 F.3d at 948; *In re Gaston & Snow*, 243 F.3d at 601–02; *In re Merritt Dredging*, 839 F.2d at 206. To be sure, that hesitation is not unfounded. As scholars have noted, "[p]art of the explanation for the departures from *Klaxon* can be found in Supreme Court dicta" in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156

---

[6] This is not to say that the Bankruptcy Code can never embody federal rules that do not appear in its specific provisions. Indeed, the Code can, and does, provide such rules of decision, such as where "pre-Code practice" has not been expressly abrogated by statute, *In re Hertz Corp.*, 120 F.4th 1181, 1198 (3d Cir. 2024), or where a rule "has long been considered fundamental to the Bankruptcy Code's operation," *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017).

(1946). Clopton, *supra*, at 2204; *see also* Tobias Barrington Wolff, *Choice of Law and Jurisdictional Policy in the Federal Courts*, 165 U. Pa. L. Rev. 1847, 1875–78 (2017). There, the Supreme Court considered whether, and to what extent, an insolvent debtor must pay interest on delinquent interest payments due under a prepetition bond indenture under Chapter X of the Bankruptcy Act. *Vanston*, 329 U.S. at 159. In doing so, the Supreme Court admonished:

> [O]bligations, such as the one here for interest, often have significant contacts in many states so that the question of which particular state's law should measure the obligation seldom lends itself to simple solution. In determining which contact is the most significant in a particular transaction, courts can seldom find a complete solution in the mechanical formulae of the conflicts of law. . . . In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits.

*Id.* at 161–62. And it is this language upon which some courts have seized to conclude *Klaxon* has no application in bankruptcy cases because it is inconsistent with some amorphous federal interest. *See, e.g.*, *In re SMEC, Inc.*, 160 B.R. 86, 91 (M.D. Tenn. 1993); *In re McCorhill Publ'g, Inc.*, 86 B.R. 783, 792 (Bankr. S.D.N.Y. 1988).

But on closer inspection, *Vanston* says nothing about what choice-of-law rule a court should employ in bankruptcy cases when non-federal law provides the rule of decision. Rather than rejecting *Klaxon*'s application in favor of fashioning a bespoke federal choice-of-law rule for bankruptcy

cases, the Supreme Court concluded that the bankruptcy courts "administer and enforce the Bankruptcy Act . . . in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles," whereas "[w]hen and under what circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by *federal law*." *Vanston*, 329 U.S. at 162–63 (emphasis added). Thus, *Vanston* did not resolve the question of what choice-of-law rule courts employ when non-federal law governs a dispute in a bankruptcy case. Instead, it merely determined that when federal law provides a rule of decision that conflicts with state law, federal law controls—a proposition that flows directly from the Constitution. U.S. Const. art. VI, cl. 2; *see also In re Gaston & Snow*, 243 F.3d at 607 (interpreting *Vanston* in this way). *Vanston*, then, embodies nothing more than foundational and uncontroversial principle that federal law reigns supreme.

In sum, the structure of the Bankruptcy Code, the purposes of our bankruptcy system, and federal courts' obligation to respect the application of state law under *Erie* and the Rules of Decision Act all support *Klaxon*'s extension to bankruptcy cases.

### III.    Nothing Requires a Federal Choice-of-Law Rule in Place of *Klaxon*

Aside from seemingly the Eighth Circuit, no other Court of Appeals has extended *Klaxon*—without reservation—to the bankruptcy context. The Ninth Circuit, as well as the Second and Fourth Circuits, have also addressed the question, taking different approaches but each evincing an unwarranted

14

suspicion of *Klaxon*'s relevance beyond diversity cases. I address each approach in turn.

The Ninth Circuit has long eschewed *Klaxon*'s rule in favor of federal choice-of-law rules. *In re Lindsay*, 59 F.3d at 948. In doing so, it stated that "the risk of forum shopping which is avoided by applying state law has no application [in bankruptcy cases], because [they] can only be litigated in federal court," and instead "[t]he value of national uniformity of approach" on this question prevails over a patchwork of state choice-of-law regimes. *Id.* Thus, "[i]n federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules." *Id.*

There are two flaws in this reasoning. First, it confuses the basis for federal jurisdiction with the question of governing law. A "federal jurisdictional grant . . . is not in itself a mandate for applying federal law in all circumstances." *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 591 (1973). Instead, as is by now clear, "it is the source of the right sued upon, and not the ground on which federal jurisdiction over the case is founded, which determines the governing law." *Maternally Yours v. Your Maternity Shop*, 234 F.2d 538,

15

540 n.1 (2d Cir. 1956).[7]  In other words, the observation that federal courts possess exclusive jurisdiction over bankruptcy cases is correct as far as it goes, but it merely identifies a potential choice-of-law question—it does nothing to resolve it.  Instead, the existence of federal jurisdiction begets the downstream question of which law governs the dispute and how to decide that question in instances of conflict.  That is a question of parties' *rights*, not federal courts' *jurisdiction*.  *See Shutts*, 472 U.S. at 818.  But by reflexively employing a federal common law choice-of-law rule, the Ninth Circuit's approach risks altering parties' rights by selecting different law than would govern outside of bankruptcy.

That points up the second problem with the Ninth Circuit's approach.  The *Lindsay* court touts a federal choice-of-law rule as carrying a great deal of "value" without greater explanation, seemingly elevating "national uniformity" for uniformity's sake.  59 F.3d at 948.  But uniformity at what cost?  Even accepting the premise that national uniformity has

---

[7] *See also DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 159 n.13 (1983) ("[W]here Congress directly or impliedly directs the courts to look to state law to fill in details of federal law, *Erie* will ordinarily provide the framework for doing so."); 19 Wright & Miller's Federal Practice & Procedure § 4520 (3d ed. May 2025 update) ("[T]he law to be applied is not selected by reference to the basis of the court's subject matter jurisdiction . . . . In other words, the choice of applicable law turns upon the source or genesis of the right or issue being adjudicated.")

inherent value,[8] the value in uniformity does not outweigh the significant incongruities a bespoke bankruptcy choice-of-law rule portends. A federal choice-of-law rule in bankruptcy cases risks altering parties' substantive rights. State law governs many issues in bankruptcy cases, but none arises more frequently than property interests. *See, e.g.*, *Butner*, 440 U.S. at 55. And the fact that a dispute turns up "in the context of a federal bankruptcy" proceeding "doesn't change much." *Rodriguez v. FDIC*, 589 U.S. 132, 137 (2020). So "[s]ince state, rather than federal, substantive law is at issue there is no need for a uniform federal rule." *Semtek Int'l Inc. v. Lockheed*

---

[8] In *Gaston & Snow*, the Second Circuit gestured at the notion that "an interest in uniformity can justify the creation of federal common law," 243 F.3d at 606, and cited the Supreme Court's decision in *Kimbell Foods* for that proposition. But *Kimbell Foods* does not speak to whether a federal choice-of-law rule should govern in bankruptcy. There, the Supreme Court determined that "the priority of liens stemming from federal lending programs must be determined with reference to federal law," *Kimbell Foods*, 440 U.S. at 726, which obviates the need of a choice-of-law inquiry because the Supremacy Clause requires application of federal rules of decision. Having concluded that federal law, rather than state law, provides the governing rule, the Court went on to define the content of that federal common law rule. And at that second step, the Court noted that "[c]ontroversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules" before "reject[ing] generalized pleas for uniformity" in favor of a federal common law rule that "adopt[s] the readymade body of state law as the federal rule of decision." *Id.* at 727–28, 730, 740.

*Martin Corp.*, 531 U.S. 497, 508 (2001).  Indeed, as the Fourth Circuit rightly noted, "[i]t would be anomalous to have the same property interest governed by the laws of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy." *In re Merritt Dredging*, 839 F.2d at 206.  But that disparity is exactly what the Ninth Circuit's approach invites, and it does so with no basis in the Code or the statutes granting federal courts jurisdiction over bankruptcy cases.  Parties' property rights do not depend on the basis for a court's jurisdiction.

The approaches of the Second and Fourth Circuits are flawed as a doctrinal matter, though difficult to distinguish from the Eighth Circuit's in practice.  Those courts have rightly observed that, in the ordinary course, the fact that a choice-of-law question arises in bankruptcy does not provide sufficient reason to depart from *Klaxon* because state law generally provides the substantive law governing a dispute, so *Erie* and the Rules of Decision Act control.  *See In re Gaston & Snow*, 243 F.3d at 607; *In re Merritt Dredging*, 839 F.2d at 206.

They also theorize, however, that there may be exceptional cases when a "compelling federal interest," *In re Merritt Dredging*, 839 F.2d at 206, would require the application of a federal common law choice-of-law rule.  Thus, they purport to adopt a safety valve by applying *Klaxon* only "in the absence of a compelling federal interest which dictates otherwise." *Id.*; *see also In re Gaston & Snow*, 243 F.3d at 607 ("We necessarily limit our holding to cases where no significant federal policy, calling for the imposition of a federal conflicts rule, exists.").  In positing that carveout, these courts hypothesize a scenario where some federal interest compels abandonment of *Klaxon*.  Though this rule may appear on its

18

face to conflict with the rule from *Klaxon*, in practice, it does not. Tellingly, neither court has actually identified—much less confronted—such a situation. And the prospect of them ever doing so seems fanciful because their hypothesis runs headlong into the presumption against, and stringent criteria for, the making of federal common law.

At the outset, it is not clear whether the federal interest the Fourth and Second Circuits hypothesize would need to conflict with a state's choice-of-law rule or the substantive law that choice-of-law rule selects. If the former, it is particularly difficult to imagine what federal interest would conflict with the use of a specific choice-of-law rule given the absence of a federal choice-of-law rule provision in the Bankruptcy Code and the Code's indifference to the law that determines parties' rights and interests. *See infra* pp. 21–23. If it is the latter, then the real problem is not the use of a state's choice-of-law rule at all. Rather, as the Eighth Circuit has properly characterized it, the problem is the incompatibility between the non-bankruptcy law chosen to govern a dispute and the federal interest, because permitting a state law to "trump" the federal interest expressed in the Bankruptcy Code "would effectively convert the [] choice of law [question] to an 'anti-preemption' [question]." *In re Schriock Constr.*, 104 F.3d at 202. In short, the resolution to that conflict is application of a federal rule of decision and its priority over state law pursuant to the Supremacy Clause, not abandonment of *Klaxon*.

Even moving past this ambiguity, embracing the alternative to *Klaxon*—a federal choice-of-law rule—must "begin[] with the recognition that federal choice of law rules are a species of federal common law." *In re Gaston & Snow*, 243 F.3d at 605. But "those cases in which judicial creation of

19

a special federal rule would be justified . . . [are] 'few and restricted.'" *O'Melveny*, 512 U.S. at 87 (quoting *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963)). Crucially, the creation of federal common law is appropriate only in "situations where there is a 'significant conflict between some federal policy or interest and the use of state law.'" *Id.* (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)). Indeed, "such a conflict [is] a precondition for" federal common law-making. *Id.* But where none exists, federal law "supplies no rule of decision," leaving non-bankruptcy law to govern the controversy. *Rodriguez*, 589 U.S. at 138.

In order to justify the Second and Fourth Circuits' approach that departs from *Klaxon*, yet requires a choice-of-law analysis—i.e., employing a federal common law choice-of-law rule—two conditions must be true: (1) there must be a sufficiently weighty federal interest in conflict with otherwise governing non-federal law to warrant fashioning a federal rule of decision to resolve conflicts among non-bankruptcy law, but (2) that interest must not be sufficiently weighty to justify fashioning a federal common law rule of decision. The former must be true to justify the "[j]udicial lawmaking" involved in crafting federal common law rules—lawmaking that "plays a necessarily modest role under a Constitution that vests the federal government's 'legislative Powers' in Congress." *Id.* at 136 (quoting U.S. Const. art. I, § 1). The latter must be true in order to preserve any choice-of-law question at all, for if the federal interest is sufficiently important to justify creation of a federal rule of decision, then there is no "choice" among laws because the Constitution invariably resolves such conflicts in favor of federal law. U.S. Const. art. VI, cl. 2. In other words, for the Second and Fourth Circuits' approach to be correct—as opposed to the Eighth Circuit's, which accounts for an

20

overriding federal interest as a matter of rule of decision, *see In re Schriock Constr.*, 104 F.3d at 202—a federal interest has to fall into the goldilocks zone: not too strong, yet not too weak.

Yet a review of the Bankruptcy Code and its policies establishes neither condition. The Code is agnostic about which body of non-bankruptcy law governs parties' rights—it simply "takes the [interest] as it finds it." *Bartenwerfer v. Buckley*, 598 U.S. 69, 82 (2023). That is to say, the Bankruptcy Code embodies no federal interest that favors the application of any particular non-bankruptcy law over another. And this makes good sense. It is "the basic federal rule" that "entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the . . . obligation." *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000). Sometimes, federal non-bankruptcy law will control that issue. *See, e.g.*, *Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 168 (3d Cir. 2002). Other times, it may be state or foreign law that does. Either way, the Bankruptcy Code directs courts to consider parties' interest under whichever law governs outside of bankruptcy, and it then establishes a collection of rules to deal with those interests.

The Supreme Court's decision in *Butner* is not to the contrary. There, the Court famously held that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. at 55. At first glance, this passage might seem to support the Second and Fourth Circuits' approach—after all, the Supreme Court included the proviso

21

"[u]nless some federal interest requires a different result." *Id.* But on closer inspection, this line from *Butner* cannot be read as suggesting the possibility of a different choice-of-law rule to apply in bankruptcy.

*Butner* addressed whether "the right to the rents collected during the period between [a] mortgagor's bankruptcy and the foreclosure sale of the mortgaged property . . . is determined by a federal rule of equity or by the law of the State where the property is located." *Id.* at 49. In other words, the Supreme Court considered which body of law—state or federal—supplies the rule of decision for allocation of rents. It concluded, as a general matter, "[p]roperty interests are created and defined by state law." *Id.* at 55. But it also recognized that, while uncommon, federal law can sometimes define parties' property interests, especially where the United States is a party.[9] *See, e.g.*, *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366 (1943). For this reason, the Court acknowledged that where federal law does govern property rights, that law controls. But *Butner* cannot reasonably be read to suggest that federal law provides the choice-of-law rule to decide among conflicting non-federal laws when it is those laws that provide the rule of decision. That is because *Butner* posits a scenario in which state property law is displaced due to "some federal interest [that] requires a different result," 440 U.S. at 55, not that this federal interest favors one state law over others. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 451 (2007)

---

[9] The scenario is far from hypothetical, as the federal government is "one of the Nation's largest lenders," *Dep't of Agric. Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 45 (2024), and is a frequent creditor in bankruptcies.

(juxtaposing *Butner* and *Vanston* to illustrate this point).  Put another way, reading *Butner* to license creation of a federal common law choice-of-law rule renders the proviso meaningless because, read in such a way, state law still governs the substantive property interest while federal law simply chooses among conflicting state laws.  That plainly is not the dichotomy *Butner* envisioned.  Instead, *Butner* stands for the far more straightforward proposition that state law generally governs parties' property interests except in the unusual case where federal law provides the rule of decision.  It offers no insight, however, into how to choose among conflicting laws when non-federal law governs.[10]

This result does not derogate those federal interests that do exist.  To be sure, there are many areas of law in which Congress has legislated extensively.  *See, e.g.*, Sherman Antitrust Act, 15 U.S.C. §§ 1–7; Securities Act of 1933, 15 U.S.C. § 77a *et seq.*; Securities Exchange Act of 1934, 15

---

[10] My concurring colleague disagrees, asserting that "[f]ederal courts can and do develop federal choice-of-law rules that select state substantive law."  Concurring Op. 13.  But the cited cases do not support that proposition; they merely recognize that courts can create federal common law rules of decision—not choice-of-law rules—that incorporate the contents of state law.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 107–09 (1991) (creating a rule of decision for derivative actions that incorporates the contents of state law rather than "displac[ing] state law in this area"); *Semtek*, 531 U.S. at 508–09 (describing the issue as "a classic case for adopting, as the federally prescribed *rule of decision*, the law that would be applied by state courts," rather than creating "a contrary federal rule" (emphasis added)); *see also infra* note 13.

23

U.S.C. § 78a *et seq.*; Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 to 80a-64; Lanham Act, 15 U.S.C. § 1051 *et seq.*; Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* Perhaps none is a greater expression of a federal interest than those statutory provisions that completely preempt state law, i.e., those where a federal interest "is so powerful," *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 23 (1983), that "federal law does not merely preempt a state law to some degree" but instead "substitutes a federal cause of action for the state cause of action," 14C Wright & Miller's Federal Practice & Procedure § 3722.2 (Rev. 4th ed. May 2025 update). Those instances are few, but important. *See Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 (1968) (Section 301 of the Labor Management Relations Act); *Metro. Life. Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987) (Section 502(a) of the Employee Retirement Income Security Act); *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003) (Sections 85 and 86 of the National Bank Act).

But again, in these instances—and all others where federal law supplies the rule of decision—there is no choice-of-law question, making *Klaxon* inapplicable. That is because the Constitution resolves vertical choice-of-law questions in absolute terms: "[I]f a state measure conflicts with a federal requirement, the state provision must give way." *Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965). In all other cases, non-federal law enjoys the usual presumption against "displacement." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988). So it is only in the absence of a federal rule of decision—that is, in the absence of a federal interest warranting displacement of non-federal law—that a choice-of-

24

law question arises.  And at that juncture, the Bankruptcy Code is agnostic about which law governs, leaving "no reason [for] such interests [to] be analyzed differently" than if they had arisen outside of bankruptcy.  *Butner*, 440 U.S. at 55.

*    *    *

The daylight between these positions—especially between those of the Eighth Circuit and the Second and Fourth Circuits—can be elusive, and the debate can easily be labeled esoteric.  Relative to the number of questions governed by state law that arise in bankruptcies across the country, those that present genuine choice-of-law questions are admittedly few.  And those whose outcome would change depending on the application of *Klaxon* versus a federal choice-of-law rule are likely fewer still.  But apart from doctrinal clarity, which carries its own virtue, resolution of this question in the manner I have proposed serves two important purposes.

First, federal courts exercise limited powers.  Perhaps nowhere is that power more at its nadir than in the area of fashioning federal common law.  As the Supreme Court has admonished since *Erie*, those contexts that necessitate a federal common law rule are fleeting, and the criteria for recognizing such a rule are exacting.  It is incumbent on us to candidly recognize the limits of our authority as a function of the Constitution's separation of powers.  After all, "[t]he Framers 'built into the tripartite Federal Government . . . a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" *Clinton v. Jones*, 520 U.S. 681, 699 (1997) (omission in original) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976) (per curiam)).  Acknowledging that the federal courts' role in crafting common law is necessarily "modest," *Rodriguez*, 589

25

U.S. at 136, does much to guard against encroachment upon Congress's authority to legislate on the subject of bankruptcies.

Second, with doctrinal clarity and the acknowledgment of federal courts' limited authority comes clearer notice to litigants as to what rule they can expect to govern their rights. As discussed, the Ninth Circuit's departure from *Klaxon* is misguided. As for the Second, Fourth, and Eighth Circuits, their approaches in practice always have, and always will, lead to the same result—*Klaxon* applies in bankruptcy, but federal law necessarily provides the rule of decision "when some federal interest requires a different result." *In re Schriock Constr.*, 104 F.3d at 202. But by framing the question as choice-of-law instead of rule-of-decision and leaving the door open for a different choice-of-law rule in theory, the Second and Fourth Circuits invite needless litigation over *Klaxon*'s applicability and leave lingering uncertainty about which law will govern parties' disputes. They hypothesize a category of cases that, in reality, is a null set. No federal interest exists that will displace a state's choice-of-law rule without simultaneously requiring displacement of state substantive law in favor of a federal rule of decision. Instead of perpetuating the uncertainty surrounding the choice-of-law rule that governs in bankruptcy, we should recognize what practice teaches and give courts and litigants alike notice of the governing

framework: The rule from *Klaxon* extends to bankruptcy cases.[11]

## IV.    Idiosyncratic State Choice-of-Law Rules Do Not License Abandoning *Klaxon*

For their part, among the options in this three-way circuit split, the parties urge us to adopt the Second and Fourth Circuits' hybrid approach to *Klaxon*, cautioning that we "should not adopt a rule that would require bankruptcy courts to follow idiosyncratic state choice-of-law rules even when doing so would create conflicts, encourage forum-shopping, or undermine significant federal interests." Appellees' Second Supp. Br. 11; *see also* Appellants' Second Supp. Br. 4. And to illustrate their point, Appellees pose the example of "a hypothetical forum state . . . reject[ing] the internal-affairs doctrine [to] allow its own idiosyncratic rules to dictate who speaks for a foreign corporation." Appellees' Second Supp. Br. 10. They insist that in such a scenario, "the federal interest in preserving the internal-affairs doctrine and orderly

---

[11] My concurring colleague agrees that "state choice-of-law rules will almost always apply" in bankruptcy but insists that "[r]are is not never." Concurring Op. at 9–10. It is telling, however, that the concurrence does not identify a single instance—even a hypothetical one—that would require the application of a federal common-law choice of law rule, but would not result, in any event, in the application of federal law as the rule of decision.

bankruptcy filings would warrant a federal choice-of-law rule vindicating the internal affairs doctrine."[12] *Id.* at 11.

But choice of law is not a panacea, nor need we make it one. Instead, among other constraints, the Constitution places limits on the extent to which states may exert regulatory authority over parties' disputes and that resolve many of the concerns the parties raise here. Four constitutional provisions in particular—the Supremacy Clause, the Full Faith and Credit Clause, the Privileges and Immunities Clause, and the Due Process Clause of the Fourteenth Amendment, each of which is discussed below—provide a federal backstop to permissible state choice-of-law regimes.

First, and most intuitively for choice-of-law purposes, is the Supremacy Clause. U.S. Const. art. VI, cl. 2. In "split[ting] the atom of sovereignty" for our federal union, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring), the Framers "provide[d] 'a rule of decision' for determining whether federal or state law applies in a particular situation," *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)). The Supremacy Clause supplies a bright-line rule to resolve "vertical" choice-of-law questions, i.e., those that implicate a conflict between federal and state law. *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547

---

[12] Apart from the reasons I describe below, I agree with the majority that such a scenario is fanciful because it would violate the Constitution. Maj. Op. 24 ("[W]hen it comes to control over corporate decision-making, a state 'has no interest in regulating the internal affairs of foreign corporations.'" (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645–46 (1982)).

U.S. 677, 691 (2006).  When federal and state law are "in conflict or at cross-purposes," the Supremacy Clause embodies the "clear rule" that federal law prevails.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).

Thus, when state courts consider which law governs a dispute, the existence of a controlling federal rule resolves any choice-of-law question, "[f]or the policy of the federal [law] is the prevailing policy in every state."  *Testa v. Katt*, 330 U.S. 386, 393 (1947).  In this way, the Supremacy Clause protects the federal authority to enact federal rules of decision to control in circumstances "necessary to protect uniquely federal interests."  *Rodriguez*, 589 U.S. at 136 (quoting *Radcliff Materials*, 451 U.S. at 640).

Often, those federal interests will be embodied in a federal statute.  But in few, yet important, contexts, federal courts have recognized the need to fashion "federal common law—substantive rules of decision not expressly authorized by either the Constitution or any Act of Congress—that supplant state law," 19 Wright & Miller's Federal Practice & Procedure § 4514 (3d ed. May 2025 update), often when the controversy's subject matter closely relates to the federal government or falls within an area of exclusive federal competence, *see, e.g.*, *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (admiralty); *Boyle*, 487 U.S. at 505–06 (civil liabilities of contractors under federal procurement contracts); *Clearfield Tr.*, 318 U.S. at 366 (rights and duties of the United States under federally issued commercial paper); *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (apportionment of water rights between states).

To be sure, federal courts' common law-making authority "plays a necessarily modest role," and the Supreme

29

Court has "underscore[d] the care federal courts should exercise before taking up an invitation to try their hand at common lawmaking." *Rodriguez*, 589 U.S. at 136, 138. But in the narrow circumstances that command a federal rule of decision absent constitutional or statutory authority, the Supremacy Clause ensures that federal courts may still fashion such a rule and that contrary state law will yield.[13] *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964) (recognizing the preemptive force of federal common law), *superseded on other grounds by statute*, Pub. L. 88-633, 78 Stat. 1013, *as recognized in*, *Fed. Republic of Ger. v. Philipp*, 592 U.S. 169, 179 (2021). After all, "exclusive state power takes up only where federal power leaves off." John Hart Ely, *The Irrepressible Myth of* Erie, 87 Harv. L. Rev. 693, 705 (1974). So that vertical choice-of-law rule, enshrined in our Constitution, does much to ensure that state choice-of-law rules do not unduly "undermine significant federal interests." Appellees' Second Supp. Br. 11.

Second, the Full Faith and Credit Clause occupies a modest, but important, position among the constitutional provisions bearing on choice of law. In relevant part, it

---

[13] When adopting a federal common law rule, federal courts must assess both "(1) the competence of federal courts to formulate a federal rule of decision, and (2) the appropriateness of declaring a federal rule rather than borrowing, incorporating, or adopting state law in point." *McVeigh*, 547 U.S. at 692. So in some circumstances, federal courts may "adopt the readymade body of state law as the federal rule of decision until Congress strikes a different accommodation," and state law yields only in the sense that it is supplanted by an identical federal rule. *Kimbell Foods*, 440 U.S. 740.

provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. art. IV, § 1, cl. 1.  As the Supreme Court has recognized, the Clause's purpose "was to alter the status of the several states as independent foreign sovereignties . . . and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin." *Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268, 277 (1935); *see also Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 439 (1943).

In modern jurisprudence, much of the Full Faith and Credit Clause's function—and that of the statute with which it shares a name, 28 U.S.C. § 1738—occurs in the recognition of judgments rendered by foreign states. *See, e.g.*, *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998).  But as the Supreme Court has recognized, the Full Faith and Credit Clause continues to have an enduring role in the regulation of "credit owed to [foreign] laws." *Id.* at 232.  Indeed, "where the policy of one state statute comes into conflict with that of another, the necessity of some accommodation of the conflicting interests of the two states is . . . apparent." *Alaska Packers Ass'n v. Indus. Accident Comm'n of Cal.*, 294 U.S. 532, 547 (1935).

Apart from its other commands, the Full Faith and Credit Clause, at a minimum, requires that a forum state confronting a horizontal choice-of-law question have "some rational basis" for applying its law over that of a sister state. *Id.* at 547–48.  That basis must be above and beyond mere favoritism toward forum law, for a state does not have a legitimate interest in discriminating against another state's law simply by virtue of its foreign origin. *See First Nat'l Bank of*

31

*Chi. v. United Air Lines*, 342 U.S. 396, 398 (1952); *Hughes v. Fetter*, 341 U.S. 609, 613 (1951); *cf. Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 878 (1985) (holding that a state does not have a legitimate interest purely in favoring domestic economic interests over foreign ones).

Of course, the Full Faith and Credit Clause "does not require one state to substitute for its own statute, applicable to persons and events within it, the conflicting statute of another state, even though that statute is of controlling force in the courts of the state of its enactment with respect to the same persons and events." *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of Cal.*, 306 U.S. 493, 502 (1939). And no doubt, in many cases, forum states will have rational, nondiscriminatory reasons for applying their law over that of others. *See, e.g., Cardillo v. Liberty Mut. Ins. Co.*, 330 U.S. 469, 476 (1947). But the Full Faith and Credit Clause does "set[] certain minimum requirements which each state must observe when asked to apply the law of a sister state," *Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 516 (1953), and it "requires that a state base its assertion of legislative jurisdiction on a claim that its interests are superior," not simply that conflicting law is foreign, Kermit Roosevelt III, *The Myth of Choice of Law: Rethinking Conflicts*, 97 Mich. L. Rev. 2448, 2505 n.240 (1999). This constitutional floor provides yet another constraint on state choice-of-law regimes.

Third, the Privileges and Immunities Clause protects out-of-staters from discrimination on the basis of their foreign

citizenship.[14] *See Supreme Ct. of N.H. v. Piper*, 470 U.S. 274, 285 (1985); *see also Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 265 (1987) (Scalia, J., concurring in part and dissenting in part) (grounding the protection "against rank discrimination against citizens of other States" in the Privileges and Immunities Clause). In full, it provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. Much like the Full Faith and Credit Clause, the Privileges and Immunities Clause was intended "to help fuse into one Nation a collection of independent, sovereign States." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948).

The Clause does not guarantee that citizens of each state are entitled to all of the same rights and benefits of citizens in other states, *see Piper*, 470 U.S. at 284, but only those that are "fundamental" to "the vitality of the Nation as a single entity," *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 382–83 (1978) (quotation omitted). It does, however, "bar

---

[14] This rule may sound identical to the constraint provided by the Full Faith and Credit Clause discussed above. But the two clauses play distinct roles. The Full Faith and Credit Clause concerns the respect owed by one state to the laws and judgments of another, while the Privileges and Immunities Clause concerns states' treatment of citizens of foreign states. *Compare* U.S. Const. art. IV, § 1, cl. 1 ("Full Faith and Credit shall be given in *each State* to the public Acts, Records, and judicial Proceedings of *every other State*." (emphasis added)), *with* U.S. Const. art. IV, § 2, cl. 1 ("The *Citizens* of each State shall be entitled to all Privileges and Immunities of Citizens in *the several States*." (emphasis added)).

discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer*, 334 U.S. at 396.

The Supreme Court has recognized that access to a state's courts is among the privileges and immunities protected by the Constitution. *McKnett v. St. Louis & S.F. Ry. Co.*, 292 U.S. 230, 233 (1934); *Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553, 562 (1920). And implicit in that guarantee is the constituent promise that a state may not withhold the application of its law to a citizen of another state in a situation in which it would extend that law to one of its own citizens solely by virtue of the out-of-stater's foreign citizenship. *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1868) (the Privileges and Immunities Clause "secures to [citizens of a foreign state] in other States the equal protection of their laws"); *see also* Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law*, 92 Colum. L. Rev. 249, 265–66 (1992). Thus, the Privileges and Immunities Clause "place[s] the citizens of each State upon the same footing with citizens of other States," thereby demanding citizens of foreign states derive the same benefit from a state's law that it would extend to its own citizens and prohibiting discrimination against out-of-staters because of their foreign citizenship. *Paul*, 75 U.S. at 180.

Fourth, and finally, the Due Process Clause of the Fourteenth Amendment substantively limits to which disputes states may extend their law.[15] In providing that "[n]o State

---

[15] The Supreme Court's articulation of the Fourteenth Amendment Due Process Clause's limitations on state choice-

34

shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, the Clause requires "that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair," *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981) (plurality). Thus, where a state does not have sufficient contacts with a dispute, it lacks legitimate interests warranting extension of its law to the dispute, rendering application of its law "sufficiently arbitrary and unfair as to exceed constitutional limits." *Shutts*, 472 U.S. at 822; *accord John Hancock Mut. Life Ins. Co. v. Yates*, 299 U.S. 178, 182 (1936); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407–08 (1930). And in doing so, the Due Process Clause

---

of-law rules has been subject to nearly universal criticism. *See, e.g.*, Roosevelt, *supra*, at 2506–07; Louise Weinberg, *Choice of Law and Minimal Scrutiny*, 49 U. Chi. L. Rev. 440, 460–63 (1982). In comparing choice of law with the Court's personal jurisdiction jurisprudence, Professor Linda Silberman famously quipped, "[t]o believe that a defendant's contacts with the forum state should be stronger under the due process clause for jurisdictional purposes than for choice of law is to believe that an accused is more concerned with where he will be hanged than whether." Linda J. Silberman, Shaffer v. Heitner, *The End of an Era*, 53 N.Y.U. L. Rev. 32, 88 (1978). I do not take a side in this debate here. My point, rather, is that wherever the constitutional boundaries lie, so long a states' choice-of-law regimes fall within them, federal courts have no authority under the Bankruptcy Code, Rules of Decision Act, or statutes granting bankruptcy jurisdiction to supplant state choice-of-law rules in favor of federal ones.

protects litigants against "unfair surprise or frustration of legitimate expectations" of the law governing their dealings.[16] *Allstate*, 449 U.S. at 318 n.24.

By recounting these well-trodden constitutional constraints, I do not seek to "embark upon the enterprise of constitutionalizing choice-of-law rules." *Sun Oil*, 486 U.S. at 727–28. Rather, these constitutional safeguards demonstrate that by extending the rule of *Klaxon* to bankruptcy cases, federal courts are not bound to reflexively apply impermissibly parochial state choice-of-law rules as Appellees warn. *See* Appellees' Second Supp. Br. 9–11. But absent running afoul of the limitations imposed by the Constitution, I find no basis (or authority) in federal bankruptcy law to constrain a state's authority to prescribe the choice-of-law rules that shall govern in its courts. Indeed, it is a feature of our federal system that it

---

[16] The Supreme Court has somewhat collapsed the inquiries under the Full Faith and Credit Clause and the Due Process Clause for choice-of-law purposes. *See, e.g.*, *Sun Oil Co. v. Wortman*, 486 U.S. 717, 729 n.3 (1988); *see also* Herma Hill Kay et al., *Conflict of Laws* 381 (10th ed. 2018) (noting the convergence in the two analyses). Yet each imposes a different command: As explained above, the Full Faith and Credit Clause governs the respect owed to laws among states, while the Due Process Clause confers an individual right to be free from application of a state's law when that state has no meaningful connection to the dispute. *Compare* U.S. Const. art. IV, § 1, cl. 1 ("Full Faith and Credit shall be given in *each State* to the public Acts, Records, and judicial Proceedings of *every other State*." (emphasis added)), *with* U.S. Const. amend. XIV, § 1 ("No *State* shall . . . deprive any *person* of life, liberty, or property, without due process of law." (emphasis added)).

"leaves to a state, within the limits permitted by the Constitution, the right to pursue local policies diverging from those of its neighbors," and "it is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws." *Klaxon*, 313 U.S. at 496.

Where states do not transcend constitutional barriers, *Klaxon*'s rule best serves the purposes of the Bankruptcy Code consistent with *Erie*, the Rules of Decision Act, and the presumption against federal common law-making. So just as *Klaxon* and *Erie* aim to preserve the substantive law governing a dispute notwithstanding the "accident of diversity,"[17] *Klaxon*, 313 U.S. at 496 (citing *Erie*, 304 U.S. at 74–77), extending *Klaxon* in this manner avoids altering the substantive law governing a dispute simply because of the "happenstance of bankruptcy," *Lewis v. Mfrs. Nat'l Bank of Detroit*, 364 U.S. 603, 609 (1961).

---

[17] Of course, *Klaxon*'s interest in diminishing forum-shopping incentives between state and federal courts, *see* 313 U.S. at 496, does not neatly map onto bankruptcy, as federal courts possess original and exclusive jurisdiction over bankruptcy cases, 28 U.S.C. § 1334(a). But just as plaintiffs may choose their favored forum in non-bankruptcy cases, consistent with proper venue, to gain a favorable choice-of-law rule, *see Ferens v. John Deere Co.*, 494 U.S. 516, 523 (1990); *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964), debtors too may choose a forum for purposes of a specific choice-of-law regime in bankruptcy cases where venue properly lies. And that sort of horizontal forum shopping incentive is "attributable to," and an irreducible component of, "our federal system." *Klaxon*, 313 U.S. at 496.

\*       \*       \*

The question of *Klaxon*'s applicability to bankruptcy has persisted for nearly 80 years. This case, just as with others our Court has encountered, permits us to elide the question of which choice-of-law methodology to employ. But we have the responsibility not to perpetuate this uncertainty. I hope that, in the appropriate case, we will resolve this question and give guidance to bankruptcy and district courts in our Circuit in a way that is consistent with the Bankruptcy Code, *Erie* and the Rules of Decision Act, and the policies underlying the grant of bankruptcy jurisdiction to federal courts.

AMBRO, *Circuit Judge*, concurring

The *Erie* doctrine—taken from *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and its progeny—is the North Star for determining whether federal or state law should apply in federal court. The answer is state law unless the matter is governed by superseding federal law, such as the Constitution, a congressional enactment, or federal common law. *See* Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, 19 *Federal Practice and Procedure* § 4501 (3d ed. 2025). *Erie* questions occur most often when federal courts sit in diversity-of-citizenship jurisdiction because those disputes usually involve only state substantive law. State law, however, includes more than just the underlying substantive law. The Supreme Court told us in *Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941), that it includes choice-of-law rules as well.

What force, if any, does *Klaxon* have in bankruptcy, where the parties' primary rights and interests are often governed by state law? We need not answer that question in a holding, as the parties agree on the law that governs: New Jersey's. *See* Wright, Miller & Cooper § 4506 (collecting cases for the proposition that courts need not determine which state's choice-of-law regime applies when the parties do not dispute that question).

Though "a pretty good reason for having 'skimmed over the conflicts problem as if none existed' was that none did exist," Henry Friendly, *In Praise of Erie – And the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 401 (1964) (citation omitted), the question whether *Klaxon* applies in bankruptcy has spawned interesting academic debate. Answers span the spectrum. *Compare, e.g.*, Zachary D. Clopton,

1

*Horizontal Choice of Law in Federal Court*, 169 PA. L. REV. 2193, 2203–06 (2021) (*Klaxon* applies without exception), *with* Tobias Barrington Wolff, *Choice of Law and Jurisdictional Policy in the Federal Courts*, 165 PA. L. REV. 1847 (2017) (*Klaxon* applies only in diversity actions). Our concurring colleague has staked out her position that *Klaxon* always applies in bankruptcy, no exceptions. Because I am uncomfortable with that view, I instead take the opportunity to make some nonbinding observations about *Erie* and choice of law.

## I. *ERIE* AND *KLAXON*

A brief refresher on the *Erie* doctrine. Despite the almost mystical fascination that has long surrounded *Erie*, it stands for three basic propositions.

First, "[t]here is no federal *general* common law." *Erie*, 304 U.S. at 78 (emphasis added). "[N]either Congress nor the federal courts can, under the guise of formulating rules of decision for federal courts, fashion rules which are not supported by a grant of federal authority contained in Article I or some other section of the Constitution." *Hanna v. Plumer*, 380 U.S. 460, 471 (1965). When the Constitution *does* authorize Congress or courts to do so, however, *Erie* has no application, and federal law displaces contrary state law through the Supremacy Clause.

Second, without a federal statute or constitutionally authorized federal common-law rule, the Rules of Decision Act, 28 U.S.C. § 1652, commands federal courts to apply the rules of decision of their forum states "in cases where they apply." The Supreme Court has developed a framework for determining when a state law falls within the scope of the Rules of Decision Act. *See Gasperini v. Ctr. For Humanities, Inc.*,

518 U.S. 415, 427–28 (1996); *Hanna*, 380 U.S. at 468. The specifics of that framework are irrelevant for our purposes.

Third, when a Federal Rule (*e.g.*, the Federal Rules of Civil Procedure) conflicts with state law, then the Rules Enabling Act, 28 U.S.C. § 2072, not the Rules of Decision Act as construed by *Erie* and other cases, determines which law applies. *See Hanna*, 380 U.S. at 463–64; *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 4–5 (1987). The Rules Enabling Act is also irrelevant for our purposes.

*Klaxon* followed *Erie* and held that a federal court sitting in general diversity-of-citizenship jurisdiction is required to use the choice-of-law rules of its forum state. *Klaxon*, 313 U.S. at 496–97. The Court's reasoning was sparse, but its decision is best understood as falling into the *Erie* doctrine's second bucket—absent some constitutionally authorized federal law, the Rules of Decision Act kicks in. State choice-of-law rules are state rules of decision under that statute. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1464 (D.C. Cir. 1995) ("A choice-of-law rule is no less a rule of state law than any other …."). But if Congress or federal courts invoke some source of constitutional authority to promulgate federal choice-of-law rules, then federal courts would instead find themselves in the first bucket. The Rules of Decision Act, and thus *Klaxon*, would no longer apply.

## II. FEDERAL COMMON LAW AFTER *ERIE*

Although *Erie* ended the *general* federal common law, the Supreme Court has been unequivocal in recognizing that the *Erie* doctrine does not entirely displace federal common law. As Justice Brandeis acknowledged in a decision released on the same day as *Erie*, federal courts may still formulate special federal common law on issues of uniquely federal

interest. *See Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (concluding that interstate water apportionment "is a question of 'federal common law' upon which neither the statutes nor the decisions of either State can be conclusive"); *see also Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (noting that federal courts may still formulate federal common law in certain areas implicating "uniquely federal interests").

For example, federal courts may still generate common-law rules when "the policy of the law is so dominated by the sweep of federal statutes and doctrines developed under them that the legal relations they affect must be deemed governed by federal law." Wright, Miller, & Cooper § 4514. Likewise, it can sometimes "be inferred from congressional or constitutional intent that the federal courts should supply the necessary rule of decision by pronouncing common law to fill the interstices of a pervasively federal substantive framework." *Id.*

To be sure, the "cases in which judicial creation of a special federal rule would be justified … are … 'few and restricted.'" *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (quoting *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963)). Before federal courts develop common-law rules, "a significant conflict between some federal policy or interest and the use of state law must first be specifically shown." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (quoting *Wallis v. Pan Am. Petrol.*, 384 U.S. 63, 68 (1966)). But when that happens, federal courts no doubt have the power to create special federal common law, including choice-of-law rules.

To recap: When Congress or federal courts validly promulgate some federal rule of decision under a source of constitutional authority, then federal law displaces contrary state law. Absent that kind of federal law, then the Rules of

4

Decision Act applies, which commands federal courts to apply state rules of decision. Even after *Erie*, federal courts retain the power to promulgate special federal common-law rules when a strong federal interest requires such rules. Those cases, however, are rare.

### III. WHAT CHOICE-OF-LAW RULES GOVERN WHEN FEDERAL COURTS SIT IN BANKRUPTCY?

This leaves our main questions: (1) Does *Klaxon* apply in federal bankruptcy litigation, and if so, (2) may federal courts ever use special federal common-law choice-of-law rules instead?

The circuits are split. The Ninth Circuit limits *Klaxon* to diversity cases, and thus federal courts must apply federal choice-of-law principles in bankruptcy cases. *In re Lindsay*, 59 F.3d 942, 948 (9th Cir. 1995).[1] The Eighth Circuit has arguably held that *Klaxon* applies categorically in federal bankruptcy cases without exception. *In re Payless Cashways*, 203 F.3d 1081, 1084 (8th Cir. 2000). I say "arguably" because that decision passes on the issue in a single conclusory sentence with no further analysis. It is thus hard to conclude that the

---

[1]    The Fifth Circuit at one time took a similar view but seems more recently to have second-guessed whether it conclusively settled the question. *Compare Wallace Lincoln-Mercury Co. v. Gentry*, 469 F.2d 396, 400 n.1 (5th Cir. 1972) ("In this federal bankruptcy case the District Court is not obliged to use the choice-of-law methodology of the forum state, Louisiana."), *with Fishback Nursery, Inc. v. PNC Bank, N.A.*, 920 F.3d 932, 935 (5th Cir. 2019) ("[I]t is an open question in this circuit as to whether courts exercising bankruptcy jurisdiction should apply forum or federal choice-of-law rules.").

Eighth Circuit contemplated and rejected the possibility of exceptions. Finally, the Second and Fourth Circuits have held that *Klaxon* applies in federal bankruptcy proceedings unless a strong federal interest justifies creating federal choice-of-law rules as a matter of federal common law. *In re Merritt Dredging Co.*, 839 F.2d 203, 206 (4th Cir. 1988); *In re Gaston & Snow*, 243 F.3d 599, 605–06 (2d Cir. 2001).

I believe that the Second and Fourth Circuits have it right. The Ninth Circuit is wrong because *Erie*, and thus *Klaxon*, is not limited to federal diversity jurisdiction. Whenever federal courts encounter an issue whose resolution is not a matter of federal law, the Rules of Decision Act compels them to use state substantive law, which includes choice-of-law rules. If the Eighth Circuit held that *Klaxon* applies without exception in federal bankruptcy cases, it is wrong as well. Federal courts after *Erie* retain constitutional power to promulgate special federal common-law rules, including choice-of-law rules, when strong federal interests justify doing so. "*Erie* did not fence off a 'local law field' constitutionally immune to federal influence; it was quite clear that exclusive state power takes up only where federal power leaves off." John Hart Ely, *The Irrepressible Myth of Erie*, 87 HARVARD L. REV. 693, 705 (1974).

## A.    *Erie* and *Klaxon* Apply Outside General Diversity Jurisdiction.

I believe it is wrong to conclude that *Erie* applies only in federal diversity cases. It applies to any "questions which arise in federal court but whose determination is not a matter of federal law." *Merritt Dredging*, 839 F.2d at 206; *see also Fagin v. Gilmartin*, 432 F.3d 276, 285 n.2 (3d Cir. 2005) (Ambro, J.) (invoking *Erie* to apply New Jersey law in a federal securities-law    case    brought    under    federal-question

6

jurisdiction). Given the three-bucket framework I described above, this makes sense. Without on-point federal law, the Rules of Decision Act governs. And that statute does not turn on the basis of federal jurisdiction. *Erie* applies just as much when a court is sitting in its federal-question or bankruptcy jurisdiction as it does in general diversity. *See, e.g.*, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (applying *Erie* in pendent jurisdiction cases); *Griffin v. McCoach*, 313 U.S. 498, 503 (1941) (applying *Erie* in interpleader cases).[2]

If we accept that *Erie* applies whatever the basis of federal jurisdiction, then it does not take much more analysis to conclude that the same is true for *Klaxon*. Both *Erie* and *Klaxon* "make clear that federal law may not be applied to questions which arise in federal court but whose determination is not a matter of federal law." *Merritt Dredging*, 839 F.2d at 206. That includes in bankruptcy. As the Fourth Circuit explained, "[i]t would be anomalous to have the same property interest governed by the laws of one state in federal diversity

---

[2] *Vanston Bondholders Protective Comm. v. Green* suggests that federal courts have wide latitude to devise common-law choice-of-law rules in bankruptcy. 329 U.S. 156, 161–62 (1946). When the Court decided that case, however, the Rules of Decision Act covered only common-law claims, and so it would not have applied to claims created by federal bankruptcy law. Clopton, *supra*, at 2205 n.76 ("For those who believe that the Rules of Decision Act plays an important role in *Erie* cases, that statute exclusively referred to common[-]law claims until two years after *Vanston* ...."). The Court's mature *Erie* cases came only later. *See, e.g.*, *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3 (1975); *Hanna,* 380 U.S. 460; *Byrd v. Blue Ridge Rural Elec., Inc.*, 356 U.S. 525, 537 (1958).

7

proceedings and by the laws of another state where a federal court is sitting in bankruptcy." *Id.*

### B. Federal Courts May Still Apply Federal Common-Law Choice-of-Law Rules in Bankruptcy Cases When Strong Federal Interests Warrant Doing So.

*Klaxon* applies in bankruptcy proceedings when addressing state-law questions; that much we agree on. The sole remaining wrinkle is whether federal courts sitting in bankruptcy must *always* apply the forum state's choice-of-law rules when the underlying issue is governed by state law. That is where I part with our concurring colleague. In Judge Krause's view, federal courts sitting in bankruptcy jurisdiction can *never* create federal common-law choice-of-law rules for some combination of five reasons.[3]

*First*, the Bankruptcy Code generally absorbs state laws to define the parties' property interests, and so it follows that state choice-of-law rules must also apply. Conc. Op. 4–6. *Second*, the Bankruptcy Code is intended to facilitate the orderly resolution of competing creditors' claims without significantly affecting their underlying entitlements, and federal choice-of-law rules, if allowed, could change the outcome. *Id.* at 6–9. *Third*, federal courts have limited power to make federal common law. *Id.* at 19–20. *Fourth*, if there were some reason to create a federal rule of decision in bankruptcy, federal courts would be better off creating a rule

---

[3] To avoid confusion on what follows, Judge Krause in part offers numbered reasons to extend *Klaxon* to the bankruptcy context. Those numbered reasons do not correspond to the numbered reasons I note below for why she believes federal courts in bankruptcy can never create special federal choice-of-law rules.

of decision rather than a choice-of-law rule. *Id.* at 19–21. And *fifth*, any federal interest strong enough to generate a federal choice-of-law rule would be explicit in the Bankruptcy Code itself; the absence of choice-of-law rules in the Code means there is never any such interest. *E.g. id.* at 21.

None of the first four arguments supports the claim that federal courts can never create choice-of-law rules in bankruptcy—they support only the lesser claim that state choice-of-law rules will almost always apply. As noted, I agree with that conclusion. My colleague's fifth argument, however, is where we part, as the Supreme Court has recognized that even when bankruptcy otherwise looks to state law, sufficiently strong federal interests may warrant creating special federal common law.

### 1.    Bankruptcy typically absorbs state law.

Our concurring colleagues observes, rightly, that federal courts sitting in bankruptcy "regularly look to governing non-bankruptcy law—often 'state law'—to determine parties' 'rights and obligations when the Code does not supply a federal rule.'" Conc. Op. 4 (citation omitted). If federal courts in bankruptcy used special federal choice-of-law rules that differed from those of the forum state, then the parties' choice of forum (or even the basis of federal jurisdiction) could change their primary rights.

This is true, but it does not establish more than we already know—*Klaxon* should ordinarily apply in bankruptcy. That federal courts confronted with state-law questions should use state choice-of-law rules to avoid jurisdiction-shopping is not an interest unique to bankruptcy. Yet even federal courts sitting in diversity jurisdiction may theoretically formulate special federal common law to protect important federal

9

interests. *See, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) (applying act-of-state doctrine in diversity case). And when courts do so, neither *Erie* nor *Klaxon* prevents them from using those rules instead of state law.

At most, that bankruptcy ordinarily absorbs state substantive law supports a background presumption that federal courts in bankruptcy will rarely have a good reason to create federal choice-of-law rules. It does not support the broader argument that federal courts can never create special choice-of-law rules in bankruptcy.

### 2.   Bankruptcy should rarely alter the parties' underlying entitlements.

Our concurring colleague next cites "renowned scholars" endorsing the "'creditors'[-]bargain' theory," which "conceptualizes bankruptcy's primary role as a means to resolve the collective action problem posed by self-interested creditors who, absent a centralized insolvency resolution system, would engage in individual collection actions under applicable non-bankruptcy law." Conc. Op. 6. On this view, bankruptcy ordinarily should not alter the parties' underlying entitlements.

I take no position on whether the creditors'-bargain theory is the best interpretation of the Bankruptcy Code as a whole. But even if it were, it would not provide an argument in support of the claim that federal courts sitting in bankruptcy lack the power to create federal choice-of-law rules. As above, this argument at most suggests that the circumstances are rare under which federal courts could justifiably create federal common law that affects the parties' underlying rights and entitlements. Rare is not never. There may be times when the purpose of the Bankruptcy Code may be best served by special

10

federal choice-of-law rules. It may be unlikely that such a circumstance would arise, but it strikes me as overconfident and unnecessary to disclaim the possibility once and for all.

### 3. Federal common law is rare.

Judge Krause next observes, again correctly, that "the creation of federal common law is appropriate only in 'situations where there is a significant conflict between some federal policy or interest and the use of state law.'" Conc. Op. 20 (quoting *O'Melveny*, 512 U.S. at 87). "'[S]uch a conflict [is] a precondition for' federal common law-making." *Id.*

Once again, the premise is true, but it does not support the conclusion. If anything, Judge Krause acknowledges that federal courts *can* create federal common-law rules when there is a sufficiently strong federal interest threatened by state law. As with her argument that bankruptcy should rarely change the parties' underlying rights and interests, this argument mistakes rareness for impossibility. For common lawmaking to be rare, rather than impossible, courts must be able to do it in at least some cases.

Judge Krause also appeals at times to separation-of-powers principles and cautions against leaving courts "to divine untold rules from some brooding cloud of federal interests." Conc. Op. 10. But this misses the point. No one has suggested that federal courts can or should exercise freewheeling lawmaking power or identify federal interests without congressional guidance. *See generally CoreCivic, Inc. v. Governor of N.J.*, 2025 WL 2046488 (3d Cir. July 22, 2025) (Ambro, J., dissenting) (rejecting that view). But *Congress* may express federal interests through statute—for example, the Bankruptcy Code—and *courts* may, in rare circumstances,

11

create federal common law to give effect to those congressionally endorsed interests, particularly when applying state law would undermine Congress's objectives.

### 4. Federal courts should create substantive rules of decision instead of choice-of-law rules.

Next, Judge Krause claims that it is hard to imagine a case involving a federal interest strong enough to justify federal common law, but not strong enough to justify a substantive rule of decision rather than a choice-of-law rule. In her view, "for the Second and Fourth Circuits' approach to be correct, … a federal interest has to fall into the goldilocks zone." Conc. Op. 20–21. Maybe so, but it will not surprise the reader to hear that this also is not an argument against the power of federal courts to create federal choice-of-law rules in bankruptcy. It is an argument for the claim that the circumstances when courts would need to do so are "few and restricted." *O'Melveny*, 512 U.S. at 87 (quoting *Wheeldin*, 373 U.S. at 651). Judicial humility cautions against making the sweeping claim, in the absence of a case or controversy before us, that no such interest can exist just because one has not presented itself.

### 5. The Bankruptcy Code contains all relevant federal interests, and a choice-of-law rule is not among them.

The only argument my colleague makes that theoretically supports her claim that federal courts can never develop choice-of-law rules in bankruptcy is that the Bankruptcy Code is a comprehensive and reticulated statutory regime whose text exhausts all potential federal interests that could justify federal common-law rules. The lack of special

choice-of-law rules in the Code means, in her view, that there is no such interest.

That premise is faulty because it would apply with equal strength to the power of federal courts to create substantive common-law rules in bankruptcy. Yet the Supreme Court has rejected that argument: "Property interests are created and defined by state law … [u]*nless some federal interest requires a different result.*" *Butner v. United States*, 440 U.S. 48, 55 (1979) (emphasis added). If the Supreme Court has recognized that strong federal interests can sometimes allow federal courts to devise special rules of decision governing the parties' underlying property interests, I do not know why those interests could not also justify special choice-of-law rules.

Judge Krause claims that *Butner* stands only for the limited proposition that a strong federal interest can justify a federal substantive rule, "not that this federal interest [could] favor[] one state law over others." Conc. Op. 22. But *Butner* does not turn on the difference between substantive law and choice-of-law rules. It supports the broader principle that the selection of state rules of decision in bankruptcy must yield to overriding federal interests. On Judge Krause's view, a sufficiently strong federal interest could warrant a federal substantive rule, but never a choice-of-law rule. The unstated assumption seems to be that there could not be a strong federal interest that would justify a federal choice-of-law rule that ultimately selects state substantive law instead of a federal substantive rule. But that assumption is also faulty. Federal courts can and do develop federal rules that select state substantive law. *See, e.g.*, *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90 (1991) (formulating federal common-law rule for demand futility in federal derivative actions that incorporates the corporate law of the state of incorporation); *Semtek Int'l*

13

*Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001) (formulating federal common-law rule for preclusion in general diversity actions and "adopting, as the federally prescribed rule of decision, the law that would be applied by state courts in the State in which the federal diversity court sits").

Judge Krause insists that cases like *Kamen* and *Semtek* are distinguishable because they involved "federal common law rules of decision—not choice-of-law rules—that incorporate the contents of state law." Conc. Op. 23 n.10. But it is unclear how that distinction defends her central claim, which I understood to be that any federal interest strong enough to authorize federal common law can justify nothing less than a uniform substantive rule. If federal courts can sometimes formulate a rule of decision whose content absorbs the law of the defendant's state of incorporation, then I do not understand why, at least in theory, they could not also formulate a choice-of-law rule that selects the law of the defendant's state of incorporation.

*        *        *

It is worth stepping back to get a clear view of my concurring colleague's argument. As I understand her, she does not believe *Erie*'s constitutional rule prohibits federal courts from developing special federal common law when the Constitution or federal statute authorizes them to do so. Nor does she believe that federal courts properly exercising their limited common-lawmaking authority lack the power to create a rule of decision that always incorporates the contents of state substantive law. At its core, her argument is merely that she cannot imagine a case in which a federal court would need to create a federal choice-of-law rule in bankruptcy. As she rightly notes, I cannot think of such a case either. Conc. Op. 27

14

n.11. But this is not an argument that federal courts lack the authority to make choice-of-law rules in bankruptcy.

## IV. CONCLUSION

We should not succumb to the "beguiling tendency" to make "[c]onflict-of-law problems … more complicated than they are." *Vanston*, 329 U.S. at 169 (Frankfurter, J., concurring). If *Klaxon*'s application in bankruptcy becomes an issue, then I would endorse the sensible, never-say-never approach of the Second and Fourth Circuits: Absent an "overwhelming federal policy [that] requires us to formulate a choice of law rule as a matter of independent federal judgment, we adopt the choice of law rule of the forum state." *Merritt Dredging*, 859 F.2d at 206; *see also Gaston*, 243 F.3d at 607 ("We necessarily limit our holding to cases where no significant federal policy, calling for the imposition of a federal conflicts rule, exists.").

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

Nos. 24-2210 & 24-2211

————————————

In re:  WHITTAKER CLARK & DANIELS INC,

Debtor

PETER PROTOPAPAS,

Appellant in No. 24-2210

OFFICIAL COMMITTEE OF TALC CLAIMANTS,

Appellant in 24-2211

————————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 3:23-cv-04151; 3:23-cv-04156)
District Judge: Honorable Zahid N. Quraishi

————————————

Argued on April 1, 2025

Before: KRAUSE, MATEY, and AMBRO, *Circuit Judges*

**<u>JUDGMENT</u>**

This cause came to be considered on the record from the United States District

Court for the District of New Jersey and was argued on April 1, 2025.

On consideration whereof, it is now hereby

**ORDERED** and **ADJUDGED** by this Court that the order of the District Court

entered on May 31, 2024, be and the same is hereby **AFFIRMED**.

Costs shall be taxed against Appellants.

All of the above in accordance with the Opinion of this Court.

ATTEST:

<u>s/ Patricia S. Dodszuweit</u>
Clerk

DATE: September 10, 2025

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA  19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

September 10, 2025

Arthur J. Abramowitz
Sherman Silverstein Kohl Rose & Podolsky
308 Harper Drive
Suite 200, Eastgate Corporate Center
Moorestown, NJ 08057

Nicholas A. Aquart
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Joseph Capobianco
Kirkland & Ellis
1301 Pennsylvania Avenue NW
Washington, DC 20004

Paul D. Clement
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Andrew J. Gallo
Morgan Lewis & Bockius
One Federal Street
Boston, MA 02110

Kathleen R. Hartnett
Cooley
3 Embarcadero Center
20th Floor
San Francisco, CA 94111

Patrick Hayden
Cooley
55 Hudson Yards
New York, NY 10001

Bryan M. Killian
Morgan Lewis & Bockius
1111 Pennsylvania Avenue NW
Suite 800 North
Washington, DC 20004

Matthew L. Kutcher
Cooley
110 N Wacker Drive
42nd Floor
Chicago, IL 60606

Evan M. Lazerowitz
Robinson & Cole
666 Third Avenue
20th Floor
New York, NY 10017

Jeremiah P. Ledwidge
Cooley
55 Hudson Yards
New York, NY 10001

Rex Manning
Kirkland & Ellis
609 Main Street
Suite 4500
Houston, TX 77002

C. Harker Rhodes IV
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Michael D. Sirota
Cole Schotz
25 Main Street
4th Floor
Hackensack, NJ 07601

Cullen D. Speckhart
Cooley
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004

Benjamin B. Sweeney
Cooley
1333 2nd Street
Suite 400
Santa Monica, CA 90401

Warren A. Usatine
Cole Schotz
25 Main Street
4th Floor
Hackensack, NJ 07601


RE: In re: In Re: Whittaker Clark & Daniels
Case Number: 24-2210 & 24-2211
District Court Case Number: 23-bk-13575
District Court Case Number: 3:23-cv-04151
District Court Case Number: 3:23-cv-04156

## ENTRY OF JUDGMENT

Today, **September 10, 2025,** the Court entered its judgment in the above-captioned matter pursuant to Fed. R. App. P. 36.

If you wish to seek review of the Court's decision, you may file a petition for rehearing. The procedures for filing a petition for rehearing are set forth in Fed. R. App. P. 40, 3rd Cir. LAR 35 and 40, and summarized below.

Time for Filing:
14 days after entry of judgment.
45 days after entry of judgment in a civil case if the United States is a party.

Form Limits:
3900 words if produced by a computer, with a certificate of compliance pursuant to Fed. R. App. P. 32(g).
15 pages if hand or type written.

Attachments:
A copy of the panel's opinion and judgment only.
Certificate of service, unless the petition is filed and served through the Court's electronic-filing system.
Certificate of compliance if petition is produced by a computer.
No other attachments are permitted without first obtaining leave from the Court.

Unless the petition specifies that the petition seeks only panel rehearing, the petition will be construed as requesting both panel and en banc rehearing. A party seeking both forms of rehearing must file the petitions as a single document. Fed. R. App. P. 40(a).

A party who is entitled to costs pursuant to Fed.R.App.P. 39 must file an itemized and verified bill of costs within 14 days from the entry of judgment. The bill of costs must be submitted on the proper form which is available on the court's website.

A mandate will be issued at the appropriate time in accordance with the Fed. R. App. P. 41.

Please consult the Rules of the Supreme Court of the United States regarding the timing and requirements for filing a petition for writ of certiorari.

For the Court,

s/ Patricia S. Dodszuweit
Clerk

s/ Pamela – Case Manager

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 25-1044

_____

In re:  WHITTAKER CLARK & DANIELS INC.,

Debtor

WHITTAKER CLARK & DANIELS INC; BRILLIANT NATIONAL SERVICES INC;
L.A. TERMINALS INC.; SOCO WEST INC.

v.

BRENNTAG AG; BRENNTAG CANADA INC.; BRENNTAG GREAT LAKES LLC;
BRENNTAG MID-SOUTH INC.; BRENNTAG NORTH AMERICA INC.;
BRENNTAG NORTHEAST INC.; BRENNTAG PACIFIC INC.; BRENNTAG
SOUTHEAST INC.; BRENNTAG SOUTHWEST INC.; BRENNTAG SPECIALTIES
LLC (f/k/a Brenntag Specialties, Inc., and as Mineral and Pigment Solutions, Inc.);
COASTAL CHEMICAL CO. LLC; MINERAL PIGMENT SOLUTIONS INC.; THOSE
PARTIES LISTED ON APPENDIX A TO THE COMPLAINT; JOHN AND JANE
DOES 1-1000; JULIET M. GRAY; KYUNG H. LEE

Official Committee of Talc Claimants,

Appellant

_____

On Appeal from the United States Bankruptcy Court
for the District of New Jersey
(Bankr. Ct. Adv. Pro. No. 23-01245)
Bankruptcy Judge: Honorable Michael B. Kaplan

_____

Argued on April 1, 2025

Before: KRAUSE, MATEY, and AMBRO, *Circuit Judges*

## **JUDGMENT**

This cause came to be considered on the record from the United States Bankruptcy Court for the District of New Jersey and was argued on April 1, 2025.

On consideration whereof, it is now hereby

**ORDERED** and **ADJUDGED** by this Court that the order of the Bankruptcy Court entered on September 25, 2024, be and the same is hereby **AFFIRMED**.

Costs shall be taxed against Appellant.

All of the above in accordance with the opinion of this Court.

ATTEST:

s/ Patricia S. Dodszuweit
Clerk

DATE: September 10, 2025

2